On Application for Rehearing
The opinion of July 30, 1999, is withdrawn, and the following is substituted therefore.
Ronald Bert Smith, Jr., was charged with and convicted of the capital murder of Casey Wilson. The jury recommended, by a vote of 7 to 5, a sentence of life in prison without the possibility of parole. The trial judge, however, sentenced Smith to death, and the Court of Criminal Appeals affirmed Smith's conviction and sentence. Smith v. State, 756 So.2d 892, 904 (Ala.Crim.App. 1998). This Court granted Smith's petition for certiorari review and heard oral arguments.
The facts of this case are adequately set out in the trial court's sentencing order, which is attached as Appendix A to the opinion of the Court of Criminal Appeals. Smith, 756 So.2d at 946-57. Smith has raised 22 issues for this Court's consideration. The Court of Criminal Appeals adequately addressed and correctly resolved the majority of those issues in its thorough, well-reasoned, and unanimous opinion. We will, however, address a few of those issues.
 I.
Smith argues that the trial court improperly allowed the jury to separate over his objection. He makes the same argument on this issue that the defendant made in Stewart v. State,730 So.2d 1203 (Ala.Crim.App. 1997) (opinion on third return to remand). The Court of Criminal Appeals rejected that argument in Stewart, and this Court affirmed. Ex parte Stewart, 730 So.2d 1246 (Ala. 1999). See also Ex parte Smith, 727 So.2d 173 (Ala. *Page 960 
1999). We must likewise reject the defendant's argument in this present case.
 II.
Smith complains of the conclusions the Court of Criminal Appeals reached in Part IV.C. of its opinion, in which that court addressed certain testimony the trial court admitted over Smith's objection. The Court of Criminal Appeals, in effect, held that Smith waived his objection to this testimony by arguing, after it was admitted, that the jury should draw from it inferences favorable to him. The Court of Criminal Appeals held:
 "[Smith's] present argument that such testimony was inadmissible is inconsistent with his position at trial. A person cannot take inconsistent positions at trial and on appeal. Therefore, we find no error in [the admission of the witness's] testimony."
Smith, 756 So.2d at 913. The Court of Criminal Appeals misapplied the rule regarding a party's taking inconsistent positions. Smith could not comment to the jury or argue with the trial court about the court's action in overruling his objection and admitting the testimony. Rather, Smith, through his lawyer, attempted to make the best of the situation, and his lawyer owed him a duty to argue to the jury any favorable inferences the testimony would allow. Smith did not, by his efforts in this regard, waive his objection. See Porter v. Jolly, 564 So.2d 434
(Ala. 1990). His position on the question whether this testimony was admissible has not been inconsistent at all. However, the other reasons given by the Court of Criminal Appeals for its holding that the admission of this testimony was not prejudicial error are correct.
 III.
In Part IX of its opinion, the Court of Criminal Appeals addressed the admission of testimony by Officer Renfroe in which he narrated to the jury what he understood to be depicted on a videotape of the incident during which the killing occurred; that videotape was made by security-surveillance cameras mounted inside the premises where the killing occurred. Although Officer Renfroe did investigate the incident and did extensively examine the scene, he had not been present during the incident to observe it personally. Nonetheless, the trial court, over the defendant's objections, allowed Officer Renfroe to describe not only the physical layout and features of the scene but also the positions, movements, and actions of the people participating in the incident. The Court of Criminal Appeals stated:
 "Although Renfroe commented on what the videotape showed, we do not find that his comments constituted a closing argument or that he usurped the jury's factfinding function."
756 So.2d at 919.
On the one hand, Officer Renfroe could legally identify the layout and features of the scene as they were depicted on the videotape, because the law allows a witness with personal knowledge of things depicted in a photograph (whether taken by videotape recorder or otherwise) to identify those things as they appear in the photograph. See Ex parte Rieber, 663 So.2d 999,1011 (Ala. 1995), and McFarland v. State, 581 So.2d 1249
(Ala.Crim.App. 1991). On the other hand, Officer Renfroe could not legally testify about his impressions of the locations, movements, and actions of the people depicted by the videotape, things that were outside his own personal knowledge. He was incompetent to testify to matters outside his own personal observation. Sheridanv. State, 591 So.2d 129 (Ala.Crim.App. 1991); Lewis v. State,535 So.2d 228 (Ala.Crim.App. 1988); Charles W. Gamble,McElroy's Alabama Evidence, § 105.01 (5th ed. 1996).
Officer Renfroe, in that incompetent testimony, invaded the province of the jury by stating his conclusions of ultimate facts, insofar as he purported to describe the presence and actions of the defendant and his accomplice. Allen v. State, 472 So.2d 1122
(Ala.Crim.App. 1985); Wyatt v. State, 405 So.2d 154, 157
(Ala.Crim.App. *Page 961 
1981); McElroy's Alabama Evidence, supra, §§ 115.01 and 127.01.
For the reasons stated by the Court of Criminal Appeals, however, any error in the admission of this testimony by Officer Renfroe was harmless. Therefore, like the Court of Criminal Appeals, we conclude that Officer Renfroe's testimony did not deprive Smith of a fair trial.
 IV.
Part XIII.D. of the opinion by the Court of Criminal Appeals concerns a statement made by the prosecutor in his closing argument: "It is a rare occasion that you have as much evidence to prove a case of this nature as we have here." The Court of Criminal Appeals held that the "prosecutor's comment [was] simply a permissible comment on the evidence." Smith, 756 So.2d at 929 (emphasis in original).
As the Court of Criminal Appeals correctly held, the prosecutor's statement was not tantamount to vouching for the credibility of the prosecutor's witnesses, as the defendant had claimed in his objection. However, the prosecutor's words "It isa rare occasion" constitute a comparison between the weight of the evidence presented in this case and the weight of the evidence generally presented in other cases, although no evidence presented in this present case related to the weight of the evidence generally presented in other cases. Thus, the appellate courts should not approve, as a permissible comment on the evidence, the prosecutor's statement here: "It is a rare occasion that you have as much evidence to prove a case of this nature as we have here."
The defendant's objection, however, stated an improper ground — that the prosecutor was vouching for his witnesses. The defendant did not object on the ground that the prosecutor was commenting on facts not in evidence. Thus, the trial court's failure to sustain the defendant's objection was not error. An objection specifying one ground excludes others. Floyd v. State,82 Ala. 16, 2 So. 683 (1887); Lee v. State, 562 So.2d 657
(Ala.Crim.App. 1989); Snider v. State, 406 So.2d 1008
(Ala.Crim.App. 1981). Under the plain-error rule, the absence of an apt objection weighs against any claim of prejudice. Ex parteKennedy, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975
(1985). Further, under the plain-error rule, we will reverse only when an "error has or probably has adversely affected the substantial rights of the [defendant]." Rule 39(k), Ala.R.App.P. As the Court of Criminal Appeals observes early in its opinion, "`[The] plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result,"'" quoting United States v. Young, 470 U.S. 1,15 (1985) (quoting in turn United States v. Frady, 456 U.S. 152,163 (1982)). In the context of this defendant's long and carefully conducted trial, any error in allowing this argument does not approach the degree of error the plain-error rule would require for a reversal.
 V.
Smith argues that the trial court inappropriately attached the "aggravating" label to evidence that should be considered mitigating. See Zant v. Stephens, 462 U.S. 862, 885 (1983) (holding that if a state has "attached the `aggravating' label to . . . conduct that actually should militate in favor of a lesser penalty," due process would require that the death sentence be set aside). Specifically, Smith argues that the trial court used his evidence of good character against him. In support of this claim, Smith points to the following portion of the trial court's sentencing order:
 "Without question, the attributes or features that make up and distinguish Smith's formative years stand in stark contrast to his adult conduct, and to this crime. They also diverge from the background of cold-blooded killers: typically products of poverty, a broken *Page 962 
home, physical or sexual abuse, and social deprivation. Smith comes from an intact, middle-class family. Yet, those characteristics cut two ways. They are concurrently mitigating and aggravating. Smith's background exposed him to virtually all of the values that are central to an ordered society; the awards of his youth opened avenues that pointed to a successful career based upon honest effort. But, Smith spurned society's road signs and took the way that led him to where he is today. He chose to wallow in the gutter; he was not born into it."
Smith, 756 So.2d at 955 (Appendix A).
The Court of Criminal Appeals did not directly address this argument, although it did conclude that the trial court considered all of the mitigating evidence Smith offered. After considering the trial court's sentencing order, however, we find this argument to be without merit. The excerpt quoted above was not part of the trial court's determination that an aggravating circumstance existed. Instead, that excerpt is contained in the trial court's discussion of how much weight should be given to Smith's argument that the killing was inconsistent with his character. The trial court determined that the killing was inconsistent with Smith's character prior to his high-school graduation. In fact, the trial court expressly found that Smith had substantially proven this nonstatutory mitigating circumstance. The trial court, however, concluded that the weight to be given this circumstance was affected by Smith's dramatic reversal of character during the five and a half years between his high-school graduation and the murder. Accordingly, it is clear that the trial court was not attaching the "aggravating" label to any conduct that should be considered mitigating. Rather, the trial court concluded that the evidence offered was mitigating, but not as mitigating as Smith would have the trial court believe. Thus, the trial court did not violate the principles set out in Zant, and the due-process guaranty does not require this Court to set aside Smith's sentence.
 VI.
Smith argues that the trial judge erred by failing to charge the jury on any lesser-included homicide offense that would not have required the jury to find that Smith had intended to kill the victim. As the Court of Criminal Appeals pointed out, Smith did not object on this point at trial, although he did include this objection in his motion for a new trial. Rule 21.3, Ala.R.Crim.P., however, provides:
 "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
Because Smith failed to object before the jury retired, we consider this argument only in the context of plain-error review. By that review, as mentioned above, we notice plain error that "has or probably has adversely affected the substantial rights of the [defendant]." Rule 39(k), Ala.R.App.P.
 "`"`Plain error'" arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). `"In other words, the plain-error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Ex parte Land, 678 So.2d 224, 232 (Ala. 1996), quoting United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985), quoting United States v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)."
Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998). *Page 963 
As this Court has held: "A defendant is entitled to a charge on a lesser-included offense if there is any reasonable theory from the evidence that would support [his theory of the case]."Ex parte Oliver, 518 So.2d 705, 706 (Ala. 1987); § 13A-1-9(b), Ala. Code 1975. To state that rule differently, a charge on a lesser-included offense is not required if there is no
"reasonable theory from the evidence that would support" giving that instruction.
This Court has stated the standard to be applied by the fact-finder in considering evidence of intoxication in a case where a defendant is charged with a crime including intent as an element:
 "In Jones v. State, 362 So.2d 1303, 1315 (Ala.Cr.App. 1978), the Court of Criminal Appeals held that the intoxication `must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime.' Also, this Court has stated that `[m]ere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act.' Gautney v. State, 284 Ala. 82, 88, 222 So.2d 175 (1969), quoting Walker v. State, 91 Ala. 76, 82, 9 So. 87, 89 (1980) (emphasis omitted). Intoxication `must be so excessive as to paralyze the mental facilities, and render the accused incapable of forming or entertaining the design to take life.' Id. The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Crosslin v. State, 446 So.2d 675 (Ala.Cr.App. 1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App. 1986), citing Maddox v. State, 31 Ala. App. 332, [334], 17 So.2d 283, 285 (1944) (other citations omitted)."
Ex parte Bankhead, 585 So.2d 112, 120-21 (Ala. 1991); see alsoChatham v. State, 92 Ala. 47, 9 So. 607 (1891).
Should the trial court have instructed the jury on the lesser-included offense of manslaughter? It should have "if there [was] any reasonable theory from the evidence that would support the position"[1] that the defendant's level of intoxication was "so extreme as to render it impossible for the defendant to form the intent to kill."[2]
Smith testified that he drank 32 ounces of gin before the killing. One of his codefendants, however, testified that Smith drank only half a can of beer before the killing. That codefendant also testified that Smith appeared to be sober at the time of the offense and that Smith drove home after the incident and did so without apparent difficulty. Further, according to the Court of Criminal Appeals:
 "[Smith] never testified that he was intoxicated, that he was so drunk he could not form the intent to kill the victim, or that he could not appreciate the criminality of his conduct at the time of the murder. In fact, he specifically testified at trial that he intended to kill Casey Wilson. Moreover, his actions during and after the murder refute his argument because they provide no evidence that he was mentally impaired in any manner when he killed Wilson. [Smith] was sufficiently coherent and aware of the seriousness of his conduct to remove the film cassette from the store's surveillance camera, which was housed in a locked box, before he left the building."
756 So.2d at 907. The Court of Criminal Appeals held that there was "no reasonable theory under the facts of this case to support an instruction on manslaughter," 756 So.2d at 907, and held that it was not, therefore, reversible error for the trial court not to give an instruction on manslaughter. *Page 964 
In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App. 1993), the Court of Criminal Appeals discussed the evidentiary threshold that must be met to trigger the requirement that the court give a charge on intoxication[3] and adopted a test applied by the New York Court of Appeals:
 "`The evidence of intoxication sufficient to warrant [an intoxication] instruction . . . may include evidence that the defendant's mental capacity has been diminished by intoxicants, but it need not [do so] in all cases. The charge may also be warranted if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent.' People v. Rodriguez, 76 N.Y.2d 918, 563 N.Y.S.2d 48, 49, 564 N.E.2d 658, 659 [(1990)] (intoxication instruction not warranted in that case because `[t]here was no evidence of when defendant ingested narcotics, the quantity ingested, or the effect they had on him' and because the record also showed that the defendant `made coherent statements both on the day of the crime and on the day of the arrest in which he described with particularity the events leading up to the crime')."
621 So.2d at 1020-21 (emphasis added in Fletcher). In Fletcher, the Court of Criminal Appeals held that a trial judge invaded the province of the jury when he concluded that the defendant had not been so intoxicated as to negate the element of intent. The trial judge had instructed the jury on felony murder but had not instructed the jury on intoxication or on manslaughter. The Court of Criminal Appeals, holding that the trial judge had erred, reversed the defendant's conviction. In that case, the Court of Criminal Appeals wrote:
 "Having concluded that a charge of intoxication was warranted, it follows that a charge on manslaughter as a lesser included offense was also warranted. See McNeill v. State, 496 So.2d [108,] 109 [(Ala.Crim.App. 1986)]; Crosslin v. State, 446 So.2d [675,] 682 [(Ala.Crim.App. 1983)]. Under the evidence presented, the appellant would have been entitled to instructions on both intoxication and manslaughter as a lesser included offense had he requested those charges at trial. Because there was no request for those charges at trial and no objections to the trial court's *Page 965 
failure to give those charges, the appellant is entitled to reversal on this appeal only if the failure to give those charges is error `"`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d [766, 769 (Ala.), cert. denied, 464 U.S. 986 . . . (1983)].' Russaw v. State, 572 So.2d 1288, 1293 (Ala.Cr.App. 1990). See also Rule 45A, A. R. App. P.
 "Under the facts presented, the appellant was entitled to an instruction on the lesser included offense of felony murder and the trial court not only charged the jury on this lesser included offense, but did so accurately and completely. The court's instruction on the distinction between the capital offense of murder during a robbery, which requires a specific intent to kill, and felony murder, which does not require an intent to kill, was clear and concise. See generally Starks v. State, 594 So.2d [187,] 193-95 [(Ala.Crim.App. 1991)]. Because the question of intent to kill is the sole and critical distinction between those two offenses, one of which carries a possible penalty of death and one [of] which does not, there is an obvious and significant benefit to a defendant in having the jury instructed that it might consider his intoxication in deciding whether he had a specific intent to kill. . . . For this reason, we conclude that the failure of the trial court to instruct the jury on intoxication `has or probably has adversely affected the substantial right of the appellant." Rule 45A, A. R. App. P, and requires that the appellant's conviction be reversed."
621 So.2d at 1021-22. (Some emphasis in Fletcher; some emphasis added.) Because it concluded, in light of the felony-murder charge, that the trial judge erred to reversal by failing to charge the jury on intoxication, the Court of Criminal Appeals inFletcher did not directly address the question whether it was plain error for the trial judge not to also charge the jury on manslaughter. However, the Fletcher court implied that where a defendant is charged with murder and a charge on intoxication is required, a charge on manslaughter will, as a matter of law, also be required.
However, in Hutcherson v. State, 677 So.2d 1174
(Ala.Crim.App. 1994), a case decided after Fletcher, the Court of Criminal Appeals held, in a case in which the defendant had been charged with murder, that a charge on manslaughter was not required even though the trial judge had charged the jury on intoxication. In that case, the Court of Criminal Appeals reviewed the evidence presented and concluded that there was not sufficient evidence of intoxication to require the charge on the lesser-included offense.
In this present case, the Court of Criminal Appeals held that even if the trial judge erred in failing to charge the jury on manslaughter, that error was harmless. The court cited Gaddy v.State, 698 So.2d 1100 (Ala.Crim.App. 1995), for the proposition that because the trial judge charged the jury on the lesser-included offenses of intentional murder and robbery, and because the jury found Smith guilty of capital murder, "it is reasonable to conclude that an instruction on any other lesser included offense would not have affected the outcome of the case." 756 So.2d at 907.
We do not address the question whether the law requires an instruction on manslaughter or any other lesser-included homicide offense where the facts are such that a charge on intoxication is required, because we conclude that the intoxication instruction was not required under the facts of this case. In large part, we reach that conclusion based on the defendant's own testimony, which was, in part, as follows:
 "Q. [By defense counsel, on direct examination] Did [your girlfriend Alexis] inform you in that letter that she no longer wished to see you?
"A. She said it would be best for us.
". . . . *Page 966 
 "Q. What were your feelings about Alexis once you received the letter from her?
"A. I didn't understand, and —
"Q. Were you hurt?
"A. I was very hurt.
 "Q. Did you think at that time that you were in love with her?
"A. Yes, ma'am, I thought I was in love with her.
"Q. Did it make you angry?
"A. Very angry.
 "Q. And I believe you have told the jury that you were drinking quite a bit of alcohol at that time, is that correct?
"A. Yes, ma'am, quite a bit of alcohol.
 "Q. When is the next time that you saw Casey Wilson [the victim]?
"A. At the store that — the Circle C that he worked at.
"Q. Was this on November 8th?
 "A. No, ma'am. I had seen him before that. I had stopped in to talk to Diane, the manager, every now and then. I had seen him, I guess, getting off work.
"Q. Do you know when that was?
"A. The end of October.
 "Q. Prior to that date, did you know where he worked? Prior to seeing him the day that you went in the store to talk to the lady that managed the store, did you know where Casey Wilson worked?
 "A. I might have seen him at the store before, but I didn't recognize him until that day I recognized him.
 "Q. That day you recognized him as being the person that you had seen on two occasions at the club with Alexis?
 "MR. TAYLOR [The prosecutor]: I object to the leading question, your honor.
"THE COURT. Don't lead the witness.
 "Q. Is that the first day you recognized him as being that person?
"A. Yes, ma'am.
 "Q. What was the next time that you recall seeing Casey Wilson.
"A. It was on November 7th.
"Q. What time did you see him?
"A. 12:00 or right after.
"Q. Who were you with at that time?
"A. Jay Zuercher.
"Q. Where were you all going at that time?
"A. We were going to Fantasia [a nightclub].
"Q. How did you happen to see Casey Wilson on that evening?
 "A. We were leaving Ashton Place, which is Chad's apartment, and — you have to pass the store, but we had stopped off.
"Q. Stopped off where?
"A. At the store.
"Q. Did you go in and buy anything?
"A. I did not.
"Q. Did Jay?
"A. I believe he did.
"Q. Did you see Casey Wilson at that time?
"A. Yes, ma'am, I did.
"Q. Where was he?
 "A. He was behind the register. There was a couple other people in the store.
"Q. Had you had anything to drink that evening?
"A. Before that?
"Q. Yes.
"A. I had had a glass of Tanqueray [gin] over at Chad's.
"Q. How big a glass of Tanqueray?
"A. One of those 32-ounce monster mugs.
"Q. And you had drank the entire thing?
"A. As far as I remember, yes.
"Q. Had you had anything else to drink?
"A. Not before.
 "Q. Did seeing Casey Wilson in the store that evening make you react at all? *Page 967 
 "A. Yes, ma'am. Like I said, I didn't understand, and I thought that maybe she had started something up with him. I knew some of the other guys — I had looked them up — that she had been with, and he was the only one I could figure.
"Q. Did you think about that after seeing him that evening?
"A. When I went to the club, yes.
"Q. How long did you think about that?
"A. Approximately two hours.
"Q. And what were your emotions like at that time?
"A. Frustrated, mad, just real mad.
"Q. Where did you go after you left Fantasia?
 "A. Stopped off at the Chevron [gasoline station/store] on South [Memorial] Parkway, and then —
"Q. Who was with you at that time?
"A. Chad and Jay come back to pick me up from the club.
 "Q. So initially you and Jay drove down to the club; is that correct?
"A. Yes. He just dropped me off.
"Q. Oh, he just dropped you off?
"A. Yes.
 "Q. And then he and Chad came and picked you up later; is that correct?
"A. Yes, ma'am.
"Q. Where did you go at that point?
"A. When they picked me up?
"Q. Yes.
 "A. We started heading back to Chad's apartment, but we stopped off at that Chevron. It's down on South Parkway. It's next to the Conoco [gasoline station] and the Pizza Hut [restaurant].
"Q. What did you do at the Chevron?
"A. I bought cigarettes.
"Q. Where did you go after that?
"A. We went to the Circle C store.
"Q. Who was driving?
"A. Chad.
 "Q. What were you thinking at the time that you got to the Circle C?
"A. I was going to get him.
"Q. What were you going to get him for?
"A. For being with Alex [apparently a reference to Alexis].
 "Q. Was there any conversation at all between you, Chad, and Jay going to the Circle C?
 "A. I asked them what the stuff was in the back of my truck. There was a bunch of stuff.
"Q. What was in the back of your truck?
 "A. There was a radar detector, several like kids' VCR tapes, there was a SouthTrust Bank bag. There was a bank bag. It was white —
 "Q. Was there any discussion about robbing a store on the way to Circle C?
"A. No, ma'am.
"Q. Was it ever mentioned?
"A. No, ma'am.
"Q. Did you tell them why you wanted to go to that Circle C?
"A. No, ma'am.
"Q. Did you direct them to where you wanted to go?
"A. Yes, ma'am.
"Q. Had you driven by any other stores prior to that time?
"A. Just the Chevron.
 "Q. Where was the vehicle parked when you got to the Circle C?
"A. Sort of pulled up behind it, and then we turned around.
"Q. Could you see into the store?
"A. No, ma'am. We were sort of on the back and side.
"Q. Who got out of the vehicle?
"A. Myself and Jay.
 "Q. Do you recall saying anything to Chad or to Jay at that time?
 "A. To tell the honest truth, no, but it's very — I mean, I couldn't see where I wouldn't say it [sic]. I might have. It's very possible that I did. *Page 968 
 "Q. You heard the statement that Chad has made that you, I believe you said earlier in December that — you said, `I'm going to kill him.' Did you hear that?
 "A. At that point in time, that's very possible I did say that.
 "Q. Did you hear the defendant say from the stand yesterday that you said, `I am going to pop the guy'?
 "A. `Pop' is not really a word I would use, but, I mean, — `kill' —
 "Q. Is it possible that you told him before going into that store, `I'm going to kill him'?
"A. Yes.
"Q. Did you ever say, `I'm going to rob him'?
"A. No.
 "Q. Did Chad have any idea why you were going into that store?
"A. No.
"Q. Did Jay have any idea why you were going in the store?
"A. No.
"Q. What happened when you got out of the vehicle?
 "A. Jay got out. We walked around to the side and I said, `Hold up here,' and I told — I just went inside the store.
"Q. What did you do once you walked into the store?
 "A. I walked back to the cooler and got that Mountain Dew [soft drink] and walked up to the cash register and set the Mountain Dew down.
"Q. Where was the clerk at that time?
"A. He was behind the register.
"Q. Did he add up the Mountain Dew?
"A. Yes.
"Q. Did he say anything to you?
 "A. He may have said, like, `Good evening' or `How is it going?' or something.
"Q. Did you say anything to him?
"A. I think I asked for a pack of cigarettes.
"Q. What did you do next?
"A. I pulled my gun out.
"Q. Did you at any time ask him for money?
"A. No, ma'am.
"Q. Did you ask him to open the register?
"A. No, ma'am. He was probably going to do it himself.
"Q. What did you do when you pulled the gun out?
 "A. I just started waving towards the bathroom and I just started yelling at him.
"Q. What were you saying to him?
"A. `Get back to the bathroom.'
"Q. And did he go back to the bathroom?
"A. Yes, he went back to the bathroom.
"Q. Did he go into the bathroom?
 "A. Not at first. Not at first. I was cussing him and yelling at him. He didn't — I don't think he knew what was going on. I pointed the gun at him, pulled the trigger, and the gun did not go off.
 "Q. Let me stop you. What were you saying to him once you got back to the bathroom?
 "A. I was accusing him of being with Alex, and I was just cussing him.
"Q. Do you recall him saying anything back?
"A. I wasn't listening to him.
 "Q. What happened once you fired — pulled the trigger and the gun didn't go off?
 "A. It scared me and it scared him. He took — he like jerked back, took a step back, and I was like, what did I — you know — and I just kind of like moved the slide back on the gun, and then — he made a move toward me, and I hit him.
 "Q. Let me stop you. When the gun didn't go off, what did you think?
 "A. I don't know that I thought. I mean, I thought — you know, the gun is not loaded. That's what I thought. *Page 969 
 "Q. That was your first thought, `I've got an empty gun;' is that correct?
 "A. I think my first thought was — you know, it didn't go off. Yes, I thought I had it empty. I mean, I knew the magazine was in it, but I guess I just didn't think I had one in the chamber — you know, one in the barrel.
 "Q. You said after the gun didn't go off, he kind of jumped back —
"A. He stepped — he went back into the bathroom, you know.
 "Q. You were startled when the gun didn't go off. What happened next?
 "A. Then he came toward — you know, while I was cocking the gun, he had taken a step towards me, and I hit him. I hit him a couple of times.
"Q. With the gun?
"A. Yes, ma'am.
"Q. How many times did you hit him?
"A. I can't recall.
"Q. Where did you hit him?
"A. In his head.
"Q. In the head? Did you hit him at all in the face?
"A. Very possible.
"Q. What happened after that?
 "A. I had a loaded gun then, and he was standing in the bathroom, and I shot him, shot him. I just started pulling —
"Q. And how far apart were the gunshots?
 "A. One right after the other, as far as — you know, they were one right after the other.
"Q. And what were you thinking at that time?
"A. I wanted him dead.
"Q. What happened after that?
 "A. Right after that, I — Jay had entered the store. I didn't know he had entered the store, but he had entered the store. Right after that I walked up to the register, and I said — he said, `Man, what are you doing?' And I said — you know, I didn't want to tell him nothing. He was running around, going crazy. I was going crazy. And I said — I just started banging — hitting the register.
"Q. What were you hitting the register for?
"A. Making it look like a robbery.
"Q. You have seen the video?
"A. Yes.
 "Q. And you have seen yourself standing in front of the register?
"A. Yes, ma'am.
 "Q. Specifically, what were you doing standing in front of the register?
 "A. Hitting both — I was hitting buttons with both hands, and — I didn't have any gloves on so I started thinking about fingerprints. You know, stuff started coming to me. I didn't want anybody tying him in with Alex and then in with me. So I just started —
"Q. What was your purpose in hitting the register, though?
"A. To hit the register?
"Q. Yes. Why were you touching the register?
 "A. To make it look — to make the alarm go off. You know, I didn't know an alarm would go off, but I knew that if you don't hit the right sequence of buttons that the register is going to — you know, not shut itself off, but they can tell. It will say `Error.'
"Q. Did the alarm go off?
 "A. With all the stuff that was going on, I cannot — I mean, obviously it did. I didn't remember it at the time.
"Q. Were you trying to get the register open?
"A. No, ma'am.
 "Q. Do you know whether or not that was the same cash register you had used when you worked in that store?
"A. I believe it was.
"Q. Did you know how to operate that register?
"A. Yes, ma'am. *Page 970 
 "Q. Now, the video shows you bending down below the register?
"A. Yes.
"Q. Where was the safe from where you were standing?
"A. It's over on the right side.
 "Q. On the right side. And on the video when you bent down, you were looking around the area below the register, is that right?
"A. Yes.
"Q. What were you looking for?
"A. The VCR.
 "Q. When you worked in that store, did they have the video set up that they had had on November 8th?
"A. No, ma'am.
 "Q. How did you know there was a camera in the store that night?
 "A. While I was standing at the register, I looked up, and that's when I realized it.
"Q. Is that what you were doing after?
 "A. Well, there is also — this wall here, there is a TV set that sits there, like right here. This is the TV set somewhere in here I saw. I believe it was on this wall where the cigarettes are, but I could be wrong.
 "Q. During the time that you were touching the register and looking around under the register, were you attempting to get money?
"A. Underneath the register?
 "Q. During the time you were touching the register or when you were under the register?
 "A. Okay. With the register, no, and then underneath the register, you can't. There is no money down there. . . .
 "Q. And you're telling this jury you were looking for the VCR?
"A. Yes.
"Q. And you eventually found the VCR; is that correct?
"A. Yes, ma'am. Searched the whole store and found it."
". . . .
 "Q. Now, the videotape also shows you sitting outside the bathroom and bending down, your shadow.
"A. Yes, ma'am.
"Q. What were you doing at that time?
"A. Picking up shell casings. I only found two, maybe two.
 "Q. Ron [the defendant], did you take anything from that store?
"A. No.
"Q. Did you go in that store to take anything?
"A. No."
(R.T. 1242-59.)
On cross-examination, Smith testified:
"A. I only saw him [the victim] twice in the club.
"Q. Only twice in the club?
"A. Yes, sir.
 "Q. The other times would be when you stopped in the store and saw him and the last time when you came back and murdered him?
"A. Yes, sir.
"Q. With intent to murder him?
"A. Yes, sir."
(R.T. at 1281-82.) The defendant himself testified that he had the intent to kill the victim. Given that testimony, and the rest of the evidence presented, we conclude that the law did not require the trial judge to instruct the jury on intoxication.
Because the intoxication instruction was not required, there is no need to consider whether, in a case where the defendant is charged with murder and an intoxication instruction would be
required, a jury instruction on manslaughter or some other lesser-included homicide offense would also be required. Because we do not reach that issue, we should not be understood as agreeing that, if the intoxication instruction had been required in this case, it would have been harmless error to fail to instruct the jury on manslaughter. *Page 971 
 Conclusion
Smith has raised other issues here, but we conclude that the Court of Criminal Appeals correctly decided those issues. Further, we have searched the record for plain error, but we have found none. The judgment of the Court of Criminal Appeals is due to be affirmed.
OPINION OF JULY 30, 1999, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
MADDOX, HOUSTON, COOK, SEE, LYONS, and JOHNSTONE, JJ., concur.
BROWN, J., recuses herself.[4]
[1] Oliver, 518 So.2d at 706.
[2] Bankhead, 585 So.2d at 121.
[3] The trial judge in this present case did charge the jury on intoxication, as follows:
 "Now, there was some testimony that the defendant was drinking and under the influence of intoxicating liquors or beverages at the time that the offense occurred. And because of that, it is necessary for me to say something to you about voluntary intoxication and whether that excuses a person of a crime.
 "Under our law the definition of the word `intoxication' is a broad one, and it includes the disturbance of a person's mental or physical capabilities resulting from the introduction of any substance into the body, regardless of whether that substance is alcohol, drugs, or some other mind-altering substance or compound. Voluntary intoxication, regardless of whether that intoxication is produced by beer, gin, any other liquor, or drugs or some other substance is never a defense to a crime. However, our state Supreme court has said that voluntary intoxication may be considered by the jury if it is relevant on the question of whether the fact of intoxication negates an element of the offense charged, meaning such as intent.
 "Now, let me repeat that. Voluntary intoxication is not a defense to a criminal charge. However, if you, the jury believe that the defendant's voluntary intoxication was of such a degree or to such an extent that it absolutely prevented him from forming or acting with a specific intent, then such finding would relieve him of responsibility for any crime which required a specific intent such as the intent to kill another person.
 "In other words, if at the time a person performs some criminal act he was so intoxicated, either from alcohol, [drugs], or a combination, that he absolutely is incapable of forming a criminal intent, then he would not be legally responsible for any criminal action which required the State to prove a specific criminal intent to kill another person as one of the elements of the crime."
(R.T. 1435-37.)
[4] Justice Brown was a member of the Court of Criminal Appeals when the court considered this case.