STUART, Justice.
Jason Michael Sharp was convicted of murder made capital because it was committed during the course of a rape or an attempted rape, see § 13A-5-40(a)(3), Ala. Code 1975. After a sentencing hearing, the jury recommended, by a vote of 11-1, that Sharp be sentenced to death. The trial court took the jury’s recommendation and sentenced Sharp to death. The Court of Criminal Appeals affirmed Sharp’s conviction and sentence. Sharp v. State, 151 So.3d 308 (Ala.Crim.App.2008).
This Court granted Sharp’s petition for a writ of certiorari to review two issues: whether plain error occurred in the admission of the testimony of the emergency-room nurse who examined the victim and *332 whether plain error occurred in the State’s exercise of its peremptory challenges.[1] We reverse and remand.
The facts of the offense are adequately stated in detail in the Court of Criminal Appeals’ opinion and will not be repeated here. See Sharp v. State, 151 So.3d at 320.
“Plain error is
“‘error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.’
“Ex parte Trawick, 698 So.2d [162,] 167 [ (Ala.1997) ].”
Ex parte Walker, 972 So.2d 737, 742 (Ala.2007).
First, Sharp contends that plain error occurred when the trial court admitted opinion testimony of a lay witness. He further argues that plain error occurred when the State referenced that testimony in its opening and closing arguments.
The record establishes that during its opening argument the State argued:
“In the meantime [the victim] is being transported to Huntsville Hospital. When she gets to the ER [emergency room], she is administered by a trauma nurse at the ER by the name of Kim Heliums. And Kim Heliums describes — when [the -victim] came in she assessed her situation and based on her experience as an ER nurse she surmised, she determined that she was dealing with the victim of a sexual assault. She began her job there in the ER to try to save [the victim’s] life. Police officers had arrived on the scene as well. And during her work with [the victim] in the ER she began to realize that she knows [the victim]. They’re both nurses, they’ve worked together, they know each other, they’re acquainted with each other, but she says that she didn’t even recognize [the victim] because of all the blood and the condition of her face, the swelling.
“She sees what she describes as a semen smear on the inner thigh of [the victim] as she is in the hospital. She points it out to the investigator. She takes a sterile gauze and she collects that semen smear that is preserved, handed to the police officer that’s in the room, and that piece of evidence continues on with us today.”
During the trial, the State called Kim Heliums, the emergency-room nurse, to testify as to what happened in the emergency room when the victim was brought in. Heliums was one of the first witnesses *333 to testify. The following occurred during the State’s direct examination of Heliums:
“[State]: Let me ask you this, Ms. Heliums. Were you working on or about January 2,1999, when [the victim] was transported to the emergency room?
“[Heliums]: Yes.
“[State]: And were you working as a nurse in the emergency room when she was transported?
“[Heliums]: Yes.
“[State]: If you would tell the folks on this jury what you recall about your shift and specifically when [the victim] was transported to the hospital.
“[Heliums]: I remember they informed us that we had a trauma coming in, it was a stabbing. And when she arrived they placed her over on the bed and we started an assessment, which is protocol for us.
“[State]: If you would just describe to us what an assessment is.
“[Heliums]: When I say rapid assessment, it’s a rapid head to toe assessment of the patient and they’re assessing their injuries, their level of consciousness, their wounds, their vital signs. So in the first three minutes I have to go head to toe on a patient, assess their airways, see if they are breathing, see if we need to set up to breathe for them, put a tube down, have two IV’s placed in the patient, and I assess perineal area and go ahead and insert a Foley catheter to obtain a urine specimen also, and I obtain labs, basically get them set up for surgery if they need to go to surgery.
‘When this patient was brought in she was placed over on the bed. They placed her on the bed and she still had foreign objects attached to her and those were left in place initially just to look at her head. She had so much swelling about her face that she was unrecognizable to me, a lot of swelling to her orbits, ones that you typically see on assaults.
“[State]: What are you talking about the orbits?
“[Heliums]: Her eyes were swollen and you usually see — we see these injuries after somebody’s been repeatedly pounded. You wouldn’t get the swelling from one blow. There was a lot of soft tissue injury about the face, sinus area, eyes. I don’t recall whether her pupils were equal at this point because there was so much swelling I couldn’t get her eyes open. Checking her airways, see if there was blood in it. She had a lot of dried blood on her. Like I said I didn’t recognize her.
“Going down her body I noticed that she' had silver duct tape, silver tape which I would call duct tape, still attached to her right hand. And on the left there was pieces of it.
“Assessing her chest they were saying that they thought she had been — they knew she had been stabbed with something and I was looking at the entrance wounds and describing them to the person [who] was writing.
“As I moved down I listened to her breath sounds and as I moved down to abdominal area, I was noting whether she had any swelling, any bruising there.
“And when I got to her perineal area I stopped.
“[State]: I’m sorry, I don’t mean to interrupt you, Ms. Heliums. But what are you saying what area the peri—
“The perineal area, the area of the groin, beneath the pubic bone, the inside of the thighs.
“[State]: Okay. Go ahead.
“[Heliums]: When I got to this point in my assessment — there were, of course, a physician at the head of the *334 bed, a trauma physician at the bed side. They were assessing the airway, getting ready to go ahead and put a tube down her throat to breathe for her and someone else was checking blood as I’m doing my physical assessment. And my role in that was doing the physical assessment and yelling out to the person that was writing. When I got to the waist area I basically stopped with what I saw and had everyone that was beside me to back up. And basically said don’t anybody get near this area, I’m going to do an assessment and I asked for certain items that I thought I would need because at this point I saw signs of bruising, some trace blood, and a dried white substance inside her thigh that I thought would be evidence.
“So I had a nurse hand me a sterile pack of two-by-two’s, I put sterile saline, a dab of saline on the two-by-two, wiped the white substance that was inside her thigh on—
“[State]: And did you suspect that as being semen, dried semen?
“[Heliums]: Yes.
“[State]: Okay.
“[Heliums]: She had lot of bruising around the perineal area, around the vaginal area, and inside the thigh, it looked traumatic.
“[State]: Okay.
“[Heliums]: Had some swelling with it. And there were one or two areas that right around that there was the dried white substance. The substance that I wiped off, I took the two-by-two, let it air dry, still didn’t let anybody near me or my area until I had collected and did what I needed to do, and then had a physician to look at the area and give me the okay to put a Foley catheter in. We were trying to get her to surgery, she was a what we would call a level one trauma. She was going to die on that table right then if we didn’t hurry up and get her to surgery.
“After I collected my specimen and made sure the physician saw the area that I had noted to have the bruising and the swelling and the trauma to, I collected my specimen and made sure that I had a policeman to hand off to continue my chain of custody. And it was placed in a paper envelope and let dry. It was documented where it was taken from and that time and by who.
“[State]: And had you, Ms. Heliums, in your work in ER, work with this whole protocol as far as assessments goes, that’s something you had regularly done in your career?
“[Heliums]: Every patient that comes into this emergency room gets an assessment. Every trauma patient gets a primary and a secondary assessment done on them.”
During Sharp’s cross-examination of Heliums, he questioned her about the medical report that detailed Hellums’s “rapid assessment” of the victim. The following occurred:
“[Sharp’s counsel]: Okay. And this condition described here, is that what you’ve described as the wounds to the vaginal area here, don’t let me—
“[Heliums]: It’s hard—
“[Sharp’s counsel]: —try to decipher any medical terms.
“[Heliums]: Vaginal orifice ecchymotic and edematous, dried clear white material noted to vagina, inner thighs, culture for possible sexual assault. Yes, that would be—
“[Sharp’s counsel]: What is the lay term for this description here? Does that describe some kind of specific condition or trauma or what does that mean?
*335 “[Heliums]: Ecchymotie is a bruising. Edematous is the swelling.
“[Sharp’s counsel]: Okay. Now you’ve described bruising and swelling in that area. And a minute ago you said that it was in the inner thigh. Was there bruising on the leg portions of [the victim] or was the bruising you described in the — specifically in the vagina area?
“[Heliums]: No. I think I said that she had bruising in the perineal area which would be the labia, the area between the labia and the upper thighs. I think there was bruising — I don’t recall how far down the bruising went, but basically what she had on the thighs was the little bit of dried blood and the whitish substance.
“[Sharp’s counsel]: So the insides of the legs other than around that immediate area were not bruised; is that correct?
“[Heliums]: You know, I don’t recall. I would hesitate to say that she didn’t have bruising because she may have had up underneath that I don’t recall. All I can tell you is what I remember seeing.
“[Sharp’s counsel]: Okay. Had you ever seen that condition before on anybody you had treated?
“[Heliums]: Yes, sir, six, seven, eight, nine times of a really traumatic rape I’ve seen that.
“[Sharp’s counsel]: Okay. And if someone — is it possible that someone could have that through any means except rape or do you know?
“[Heliums]: No. I’m sure you could have bruising and edema from any number of traumas.
“[Sharp’s counsel]: Okay. And it’s possible that people could get that kind of bruising and you would never see them because they didn’t come in to be — they wouldn’t have to be treated with that particular kind of bruising, would they? That’s not life threatening, is it?
“[Heliums]: With that type of bruising and amount of swelling you would have a lot of pain.
“[Sharp’s counsel]: Okay.
“[Heliums]: Now whether you chose to stick it out at home and not come to the ER [emergency room], I don’t know, I can’t answer that. But I can tell you that from my experience I have only seen that amount of bruising and swelling in the labia from a sexual assault.
“[Sharp’s counsel]: Now tell us what training, if any, you have in specific determinations of sexual assault or sexual crimes? Do you have any specific training other than your nursing training that qualifies you to tell us that this person was sexually assaulted and this person doesn’t look like they were? Tell us how you—
“[Heliums]: Okay. I’ll give you a list of my certifications, which all — a lot of the trauma classes encompass the whole area as far as a physical assessment and history. I have a BCLS, which is Basic Life Support. I have a ACLS, which is Advanced Life Support. I have CATN which is Course of Advanced Trauma Nursing. I have taken and I teach Trauma Nursing Core Curriculum. I have taken and I teach Emergency Nurse Pediatrics Advanced Life Support core curriculum. Any number of other certifications for continuing education credits I have taken, those are too numerous to count. But I have been to in-service in rape and specimen collections. When [at] the SANE project, it’s been probably nine years ago, I got certified in a sexual assault examination with a camera.
*336 “[Sharp’s counsel]: Are there any other factors other than your visual observations that you would use in making your determination that this was a sexual assault or rape? What other factors on your extensive training there that you’ve described would you consider or deem relevant?
“[Heliums]: Would you repeat the question?
“[Sharp’s counsel]: What other factors would you look for other than just the visible signs you’ve just described? Are there any factors that you would consider in making that determination?
“[Heliums]: If I understand what you’re asking me after I had done a complete assessment on a patient and noted the extensive swelling and bruising and a substance that looked like semen on there and duct tape still bound to the hands and just — I guess the whole picture comes down for me personally I would think that. But I wasn’t — at this point when I was doing my assessment as a role, I was taking care of the patient to the best of my ability and assessing and obtaining specimen collection. It wasn’t — it wasn’t in my intent at that point to say she’s been raped, yes no, I saw—
“[Sharp’s counsel]: But that’s your opinion, isn’t it?
“[Heliums]: If I could have an opinion, yes, she was brutally raped.”
The State argued during its closing argument:
“Again when [the victim] gets to the hospital Kim Heliums is there and she testified that she recognized or believed that when [the victim] first came in she was dealing with a victim of a sexual assault, based on years of experience in dealing with this type of situation. She observed a semen smear on the interior thigh of [the victim]. She observed swelling and bruising of the vaginal area. She described that condition as being very painful. And she also says— she used that word ‘brutal’ again. She said, ‘It appeared to me that [the victim] has been brutally raped.’
“Was [the victim] raped that day? Yes, she was. The evidence is there.”
First, Sharp argues that plain error occurred when the trial court allowed Hel-iums to testify on direct examination by the State as an expert -witness without requiring the State to establish that she possessed the requisite “knowledge, skill, experience, training or education” to make certain assessments. See Rule 702, Ala. R. Evid. A review of the State’s direct examination of Heliums, however, establishes that the State did not proffer Hel-iums as an expert witness. The State elicited testimony from Heliums as the nurse who assessed the victim when the victim arrived at the emergency room. Hellums’s testimony on direct examination provided the jury with insight into the injuries Heliums observed on the victim and the level of trauma the victim had suffered. Hellums’s statement that “we see these injuries after somebody’s been repeatedly pounded” did not invade the province of the jury, as Sharp argues, but constituted testimony from a lay witness rationally based on her perception and was helpful to a clear understanding of her testimony. It provided the jury with a measure of the severity of the victim’s injuries. See Rule 701, Ala. R. Evid. (“If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determina *337 tion of a fact in issue.”).[2] Cf. Burke v. Tidwell, 211 Ala. 673, 101 So. 599 (1924) (lay witness permitted to testify that a person was “drunk”). Plain error does- not exist in this regard.
Next, Sharp argues that Hel-lums’s testimony on cross-examination that “[i]f I could have an opinion, yes, she was brutally raped” also invaded the province of the jury and that plain error occurred when the trial court admitted the testimony into evidence. According to Sharp, Hellums’s opinion that the victim had been brutally raped invaded the province of the jury and allowing her to so testify constituted plain error.
The record establishes that the alleged error in the admission of Hellums’s opinion testimony did not occur because Sharp merely remained silent and permitted the error, if any, to occur. The record unequivocally establishes that Sharp, himself, created the alleged error by eliciting the testimony.
“ ““ “ ‘A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.’ ” ’ Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App. 1995), aff'd, 680 So.2d 909 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App. 1990). As we have said in applying the invited-error doctrine, ‘ “It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.’” Murrell v. State, 377 So.2d 1102, 1105 (Ala. Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). ‘The invited error rule has been applied equally in capital cases and noncapital cases.’ Rogers v. State, 630 So.2d 78, 84 (Ala.Crim.App.1991), rev’d on other grounds, 630 So.2d 88 (Ala.1992), affd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).”
“‘Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). “ ‘An invited error is waived, unless it rises to the level of plain error.’ ” Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim. App.1998), aff'd, 778 So.2d 237 (Ala. 2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).’
“McNabb v. State, 887 So.2d 929, [982-83] (Ala.CrimApp. 2001).”
Clark v. State, 896 So.2d 584, 640-41 (Ala. Crim.App.2000) (opinion on return to remand and on application for rehearing).
*338 “The United States Supreme Court has stated that the plain error doctrine should be used in those situations that ‘ “seriously affect the fairness, integrity or public reputation of judicial proceedings United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).”
Knight v. State, 675 So.2d 487, 496 (Ala.Crim.App.1995).
The Court of Criminal Appeals in Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006) (opinion on return to remand), addressed the ultimate-issue rule in a plain-error context, stating:
“Lewis also argues that ‘the State improperly examined [eyewitness April] Hargedon.’ Specifically, Lewis contends that the State should not have asked Hargedon what Free and Lewis ‘were going to do with Kaye [the victim],’ because the question called for ‘speculation, state of mind, and violated Rule 704[, Ala. R. Evid.,] in that it violates the ultimate issue rule.’ (Lewis’s brief, p. 35.) Because this claim was not raised below, we review it for plain error.
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Rule 704, Ala. R. Evid., provides that ‘testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.’ ‘An ultimate issue has been defined as the last question that must be determined by the jury. See Black’s Law Dictionary [1522 (6th ed.1990) ].’ Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim. App.1997).
“As the State correctly points out, the ultimate issue in this case was whether Lewis participated in the intentional killing of Tim Kaye, and, if so, whether the murder occurred during the course of a first-degree kidnapping. As set out in our recitation of facts, Hargedon testified at length regarding the circumstances surrounding Lewis and Free’s beating of the victim, Tim Kaye. During her testimony, Hargedon told how Lewis came out of his mobile home carrying a shotgun. Hargedon recounted her fear and the need to ‘get out of there ... [b]ecause they were fighting and there were guns.’ (R. 239.) Harge-don was asked: ‘What were [Lewis and Free] going to do to Tim Kaye?’ to which she responded: T guess finish it. I don’t know.’ (R. 239.)
“We do not consider Hargedon’s testimony to constitute a comment on the ultimate issue of fact. Hargedon’s testimony was nothing more than a lay opinion based on her personal knowledge and observations of what happened that night. Rule 701, Ala. R. Evid., provides:
“ ‘If the witness is not testifying as an expert, the witness’s testimony in the form of an opinion or inference is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.’
“Hargedon’s opinion was rationally based on her perception of the events that occurred that night and her knowledge of the circumstances surrounding Kaye’s murder. As such, it was helpful to a clear understanding of her testimony. See, e.g., Gavin v. State, 891 So.2d 907, 969-70 (Ala.Crim.App.2003), cert. *339 denied, 891 So.2d 998 (Ala.2004). We do not consider Hargedon’s testimony an opinion as to Lewis’s guilt or as to how his case should be resolved. Moreover, we find it unlikely that any of the jurors would have substituted Hargedon’s opinion for their own judgment. Thus, Har-gedon’s testimony did not violate the ultimate-issue rule.”
24 So.3d at 503-04.
We conclude that the admission of Hel-lums’s testimony that the victim had been brutally raped did not constitute plain error. Like the witness’s testimony in Lewis, which did not comment on an ultimate issue of fact, Hellums’s testimony did not embrace an ultimate issue of fact. Here, the ultimate issue for the jury to determine was whether Sharp murdered the victim and, if so, whether the murder occurred during the course of the rape. Hel-lums’s testimony did not implicate Sharp, nor did it offer an opinion on whether he was guilty or how the case should be resolved. Thus, Hellums’s testimony did not violate the ultimate-issue rule, and error, if any, in its admission did not rise to the level of plain error.
Based on our review of the entire record, we further conclude that error, if any, in the State’s opening and closing arguments did not rise to the level of plain error.
“In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the United States Supreme Court stated the following concerning a prosecutor’s responsibility:
“ “The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vig- or — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce- a wrongful conviction as it is to use every legitimate means to bring about a just one.
“ ‘ “It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.”
“ ‘295 U.S. at 88, 55 S.Ct. 629. “ ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ ” Reeves v. State, 807 So.2d 18, 44-45 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997). The standard for evaluating the propriety of a prosecutor’s argument is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
*340 «< u prosecutor may argue in closing any evidence that was presented at trial. He may also “ ‘present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.’ ” Williams v. State, 601 So.2d 1062, 1073 (Ala.Cr.App.1991), aff'd without opinion, 662 So.2d 929 (Ala.1992), quoting Donahoo v. State, 505 So.2d 1067, 1073 [ (Ala.Grim.App.1986) ].’ ”
“‘Broadnax v. State, 825 So.2d 134, 208 (Ala.Crim.App.2000), quoting Williams v. State, 627 So.2d 994 (Ala.Crim.App.1992), aff'd, 627 So.2d 999 (Ala.1993).’
“Turner v. State, 924 So.2d 737, 766-67 (Ala.Crim.App.2002).”
Ex parte Walker, 972 So.2d 737, 744-45 (Ala.2007).
The State’s statements with regard to Heliums and her testimony during its opening and closing arguments, when viewed in context, do not rise to the level of plain error that so infected the trial with unfairness as to make Sharp’s conviction a denial of due process. Indeed, as illustrated by the following statements of Sharp’s counsel during his closing argument, Sharp recognized Heliums’s testimony for what it was:
“Then we heard from Nurse Heliums. Now in thirteen years of trying criminal cases I don’t think I’ve ever heard what is supposed to be unbiased medical objective testimony brought to you quite like Nurse Heliums did. And the reason is she knew [the victim]. She told you that. And the judge is going to instruct you on when you weigh the credibility of witnesses and their testimony and whatever weight you’re going to give to them that you can consider what kind of bias a witness may have. You can consider that legally in your weight of their testimony. You can consider if there’s a degree of kinship or friendship or whatever interest in the outcome one may have in the, case.
. “Now Kim Heliums testified as a State’s witness. And she sounded very much like a State’s witness. She even used a term typically reserved for police, T was going to preserve the chain of custody of this sample.’ And then she testified to something a little unusual. She’s on the stand talking about her objective observations and she said [the victim] had a beautiful head of hair. What does that have to do with her observation medically of that lady at the hospital that day? Other than to show she’s so emotionally wrapped up in this that she’s going to say whatever she needs to say. And I guess the most troubling part of Ms. Hellums’s testimony, because she got a little hostile when pressed about anything that ran contrary to what she had to say. In fact, I asked her about her qualifications and she rattled off her resume of all of her training to make the determination that this was a sexual assault.
“Well, her words were ‘[I]t was one of the most traumatic things I’ve ever seen.’ [The State] just said she used the word ‘brutal.’ And then the only qualified medical doctor [Dr. Stephen Pastlinik * ] is put on the stand and he tells you the complete opposite. Dr. Pastlinik has performed almost three thousand autopsies and he gets on that stand as a highly qualified physician, medical examiner, a pro, and he does a thorough, objective, physical examination. And his exact words written in his report are that the vaginal area and the labia area were free of trauma. Free of trauma. That doesn’t even remotely fit what Kim *341 Heliums said. And the State tried to clean that up, well there may be some medical reason for it not — that runs afoul of even what Dr. Pastlinik said when I asked him about how bruising takes place and how it can be maintained after someone’s death. And probably the most telling question in this whole trial was I asked Dr. Pastlinik if someone testified just before you here that that was the most traumatic sexual assault evidence they’d ever seen, would that be consistent with your findings? And he said, ‘[H]eck no.’ Heck no. Who are you going to believe? [3]”
When the statements of the State are reviewed in the context of the record in its entirety, especially the opening and closing arguments of both the State and Sharp, it is apparent that any error in the State’s argument did not seriously affect the fairness or integrity of Sharp’s trial or substantially prejudice Sharp. Plain error did not occur.
Sharp further contends that his due-process rights were violated when the State used its peremptory challenges to remove African-Americans from the jury venire, thus violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he argues that plain error occurred during the jury selection when, he says, the State failed to strike prospective white jurors- for the same reasons it struck prospective African-American jurors.
“ ‘ “ ‘For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).’ ” ’
“Smith v. State, 756 So.2d 892, 915 (Ala. Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).”
Ex parte Walker, 972 So.2d at 742.
Following the strikes for cause, 14 African-Americans remained on the venire. The State had 30 peremptory strikes to exercise; Sharp had 29. The State used its peremptory strikes to remove 11 of the 14 African-American veniremembers. Sharp struck two African-American veniremembers. One African-American veniremember served on Sharp’s jury.
The State maintains that no inference can be made from the record that it engaged in purposeful discrimination because, it says, the record contains race-neutral reasons for striking the 11 African-American veniremembers. We have reviewed the voir dire and the jury questionnaires of the veniremembers.[4] Some *342 of the veniremembers answered questions during voir dire; others did not. The record supports Sharp’s contention that the State struck some African-American jurors whose responses to the questions posed in the jury questionnaires were similar to the responses of white jurors, although it did not strike the white jurors. Therefore, the record creates an inference of discrimination on the part of the State. Although the State may have race-neutral and nondiscriminatory reasons for its actions, it was never required to articulate them on the record, and the record on its face is not adequate for us to determine whether a Batson violation occurred. Therefore, although we realize that the Court of Criminal Appeals did not have before it and was not required to review the juror questionnaires, we conclude that it is necessary to reverse its judgment and remand this case to the Court of Criminal Appeals for it to order further proceedings consistent with this opinion. See Floyd v. State, [Ms. CR-05-0935, September 28, 2007]-So.3d-(Ala.Crim.App.2007); Lewis v. State, supra. If the State cannot provide racially neutral reasons for the use of its peremptory challenges against African-American veniremembers, Sharp must receive a new trial. Ex parte Bankhead, 585 So.2d 112 (Ala.1991); Ex parte Jackson, 516 So.2d 768 (Ala.1986).
REVERSED AND REMANDED.
COBB, C.J., and WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
LYONS and MURDOCK, JJ., concur in the result.
SHAW, J., recuses himself.*

. Neither of these claims was presented to the trial court or to the Court of Criminal Appeals; however, Rule 39(a)(2), Ala. R.App. P., provides:
"(2) Death-penalty cases. When the Court of Criminal Appeals has affirmed a sentence imposing the death penalty, counsel who represented the appellant on appeal to the Court of Criminal Appeals or successor counsel shall prepare and file in the Supreme Court a petition for a writ of cer-tiorari for review of the decision of the Court of Criminal Appeals. That petition shall be governed by this rule, except that:
"(A) In addition to the bases for consideration of petitions for the writ of cer-tiorari listed in subsection (a)(1) of this rule, a petition for a writ of certiorari will also be considered from a decision failing to recognize as prejudicial any plain error or defect in the proceeding under review whether or not the error was brought to the attention of the trial court or the Court of Criminal Appeals.”

. The Advisory Committee's Notes to Rule 701, Ala. R. Evid., state:
"Alabama has long recognized ... that a lay witness may give an opinion when the witness is unable to relate the facts to the jurors well enough to place the jurors in as good a position as the witness was in to reach an opinion or to draw a conclusion. Some would call this the ‘collective facts’ exception the opinion evidence rule.”

 Note from the reporter of decisions: This witness’s last name’is spelled “Pustilnik” in the Court of Criminal Appeals' opinion at 151 So.3d 308.

. The record indicates that on cross-examination Pastlinik testified that the victim's labia majora, labia minora, clitoris, and vaginal entrum were free of trauma. When asked by Sharp’s counsel if the injuries to the victim’s genitalia were traumatic, he stated that the victim had two lacerations to the bottom of her vagina but that he would not "call that traumatic.” On redirect examination, Dr. Pastlinik stated that the injuries to the victim’s body were consistent with injuries suffered by other victims of sexual assault and that when he examined the victim's body liv-idity may have obscured some of the bruising Heliums had observed. He further stated that the lacerations to the victim’s rectum were an indication of penetrative trauma to the rectum suffered at or near the time of death. On re-cross-examination, Dr. Pastlinik testified that he could not determine whether the injuries were the result of consensual or noncon-sensual intercourse.

. The questionnaires were not included in the record on appeal. See Rule 10(a)(6), Ala. R.App. P. However, pursuant to Rule 18.2(b), Ala. R.Crim. P., we requested that the *342 circuit court clerk forward to this Court the juror questionnaires to facilitate our plain-error review.