On Remand from the Alabama Supreme Court and on Application for Rehearing on Return to Second Remand

PER CURIAM.
The opinion issued on March 23, 2012, on application for rehearing on return to second remand,[1] is withdrawn, and the following opinion is substituted therefor.
Jason Michael Sharp was convicted of capital murder because it was committed during the course of a rape or an attempted rape, see § 13A-5-40(a)(3), Ala.Code 1975. By a vote of 11 to 1, the jury recommended that Sharp be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Sharp to death.
On appeal, this Court remanded this case for the trial court to amend its sentencing order. Sharp v. State, 151 So.3d 308 (Ala.Crim.App.2008) (“Sharp I”). On return to remand, we affirmed Sharp’s conviction and sentence. Sharp v. State, 151 So.3d 308, 327 (Ala.Crim.App.2008) (“Sharp II ”). The Alabama Supreme Court, after granting certiorari review of Sharp’s petition, reversed this Court’s judgment. The Court, applying the plain-error standard of review, held that “the *347 record creates an inference of discrimination on the part of the State” in its use of its peremptory strikes. Ex parte Sharp, 151 So.3d 329, 342 (Ala.2009). See also Rule 45A, Ala. R.App. P. Because the State had not been required to articulate on the record its reasons for the use of its peremptory strikes and because the record before the Supreme Court was not adequate for that Court to determine whether a violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), had occurred, the Court remanded the case for this Court to order further proceedings. Ex parte Sharp, 151 So.3d at 342. This Court then remanded the case for the trial court to conduct a Batson hearing at which the State was to provide its reasons for its peremptory strikes against African-American veniremembers and the trial court was to determine whether the prosecution had used its strikes in a racially discriminatory manner. See Sharp v. State, 151 So.3d 342 (Ala. Crim.App.2010) (“Sharp III”).
On remand, the trial court complied with our instructions and, on April 27, 2010, conducted a Batson hearing. During that hearing, the State provided its reasons for striking African-American veniremembers. The trial court allowed Sharp to file a written response to the prosecution’s reasons for striking African-American venire-members. In his response, Sharp argued that the State’s reasons for striking African-American veniremembers were pre-textual. Thereafter, the State filed a written reply to Sharp’s response. On July 16, 2010, the trial court entered an order finding that the prosecution had offered race-neutral reasons for its peremptory strikes against African-American veniremembers and that those reasons were not pretextual. The trial court found further that the State therefore had not violated Batson in the exercise, of its peremptory strikes. This Court affirmed. Sharp v. State, (Ala.Crim.App.2010) (opinion on application for rehearing and return to second remand) (“Sharp IV”).
The Alabama Supreme Court, in an order dated October 18, 2012, summarily vacated our judgment in Sharp IV and remanded the case “with instructions that [the Court of Criminal Appeals] allow the parties to brief the issues raised by the trial court’s Batson order and that it then address those issues by further opinion.” (No. 1111489). In compliance with the Supreme Court’s instructions, we ordered briefing on the issues raised by the trial court’s Batson order. The parties completed briefing on December 17, 2012. We now have again reviewed the trial court’s Batson order, and we again affirm.[2]
The venire in Sharp’s case consisted of 80 potential jurors. The trial court excused nine of the veniremembers for cause. Of the remaining jury panel of 71 members, 14 were African-American and 57 were Caucasian. The prosecution struck 30 potential jurors, and the defense struck 29 potential jurors, with each party’s last strike serving as an alternate *348 juror. The State used 11 of its 30 strikes to remove African-American venire-members, removing all but 3 African-Americans from the venire. The defense struck two African-American venire-members. One African-American sat on Sharp’s jury.[3]
At the Batson hearing, the State articulated its reasons for striking the 11 African-American veniremembers.[4] Regarding Juror no. 55, the State provided as follows:
“[T]he State would then start with Juror Number 55. And the State would put forth as the reasons that Juror Number 55 was struck by the State, first and foremost, that the juror was opposed to the death penalty. And that was evidenced in the juror’s questionnaire, specifically Question Number 53, and then in that the juror had responded that they would automatically vote against the death penalty. Also in 53 the juror wrote opposed with respect to the death penalty.
“And then in the general voir dire of the panel, the juror expressed opposition to the death penalty. And in individual voir dire, the juror said that she could only impose the death penalty if she had to.
“Further, the prosecution noted that in the juror’s work that she dealt extensively with victims of abuse in her work and that she was a witness in many cases. She was in, specifically—
“Do you have her questionnaire?
“She was a social service case worker, Judge. And that was of some concern to the State in that case, as I have noted. She had been a witness in many cases because of her work.
“Juror further acknowledged that she knew trial counsel....
“And then later of lesser importance to the State was the fact that she knew Your Honor in the case.
“We also noted in her questionnaire that her son had been a victim of an attempted murder case and that there had never been any conviction or prosecution in that attempted murder case.
“And, Judge, those are basically the reasons that the State struck Juror Number 55.”'
(Record on Return to Remand (“RTR”), R. 5-6.)
The State gave the following reasons for striking Juror no. 37:
“[T]he reasons that we struck Juror Number 37, generally speaking, is he was opposed to the death penalty. On his questionnaire, on Question Number 53 that asked about personal, ethical, or moral beliefs' against the death penalty that you’d automatically vote against it. He left it blank. He did not answer that. And then it was his feelings on the death penalty were uncovered during the voir dire portion of the trial in that he said he had a religious or moral objection to the death penalty.
“And then also in individual voir dire he said that the Bible teaches that vengeance is the Lord’s.
“Additionally in individual voir dire he said he would not be able to live with himself if he had anything to do with the *349 defendant receiving the death penalty. That was the main reason that he was struck.
“And further there was his questionnaire there was just — there were so many questions that were left blank by this particular prospective juror, and included in those, I’ve already mentioned Question Number 53, as well as 54. He left blank Question 55. He left blank Question 56 having to do with should a defendant have effective assistance of counsel. Question 60 about whether the death penalty was used too often or not.
“We additionally noted his occupation, Judge, as being a custodian, and that was of some importance to us, besides the death penalty issues, in that as the Court is well aware that this was a circumstantial case that really the thrust of the State’s evidence was DNA evidence, as the Court knows is somewhat sophisticated and technical evidence. So his sophistication socially or professionally was noted by the State.
“And those are the reasons that the State struck Juror Number 37.”
(RTR, R. 8-10.)
As to Juror no. 65, the State gave the following reasons:
“Juror Number 65, Question 53 in his questionnaire, again having to do with the death penalty, he answered in the affirmative that he would automatically vote against the death penalty. Additionally in Question 54 when the question asked if you have some feelings against the death penalty which fall short of the previous question, this prospective juror wrote, “Vengeance is mine saith the Lord, no man.’ It says, ‘believe life in prison instead.’ That was Question 54.
“And then also in Question 62 he also answered in the affirmative that you would automatically vote for its imposition. And then in voir dire of the entire group, the general voir dire, he raised his hand as having a religious or moral objection to the death penalty.
“In individual voir dire he said, ‘I am not in favor of the death penalty.’ He additionally said there might be some instances where maybe a juror could impose the death penalty. When asked in individual voir dire, could you impose the death penalty, he said, T don’t think so.’
“He also noted in voir dire that he had some family obligations that might prevent him from jury service.
“And those were the main factors of why Juror Number 65 was struck.”
(RTR, R. 10-11.)
Regarding Juror no. 39, the State explained:
“The next would be Juror Number 39. The first thing of note to the prosecution in this case was the fact that this juror was Seventh Day Adventist, his religion, that the Court had engaged the entire panel in general voir dire about possible service on Saturday and that this would conflict with his religious beliefs. That was our primary reason for striking him, that was he noted he was Seventh Day Adventist in his questionnaire in Question Number 8 and then also acknowledged that in voir dire.
‘We also noticed from his questionnaire that he was unemployed and there was scant information from him about his employment. That was another factor in that.
“And then in Question Number 44, it says something about him or family in the ministry, and he indicated in there— it was not completely clear, I believe, judge. It says do you or any relative or close personal friend belong to any group or organization which [A.] minis *350 ters to prisoners or inmates, B. Provides legal, social, or other assistance to prisoners, inmates, or ex-cons? He answered yes. And it says please explain. He said prison ministries. That, too, was a factor in our eliminating him from the jury.
“We also note in Question 26 that a friend of his was a pastor.
“Then in Question Number 79 at the end of the questionnaire, having to do with media and whether a particular juror could be fair, this juror answered, Juror Number 39 answered that he could not, not be fair.
“Also there was some — on Question Number 24, he didn’t fully answer, have you, family, friend been accused of a crime. But there was no more information on that other than yes.
“And those are the reasons that the State struck Juror Number 39.”
(RTR, R. 11-12.)
The State said as follows for striking Juror no. 52:
“Next would be Juror Number 52. The first thing we noted in reviewing the questionnaires was that this juror’s religious denomination was that of a Sabbath Keeper, which is nearly identical to Seventh Day Adventist, which brought up the possibility of a conflict as further discussed about the earlier juror and the possibility of the Court having to work through Saturday on this case.
‘We also noticed in Question Number 26 that this juror had studied or was studying to become a minister. And it was determined that that was not the kind of juror we were looking for. We additionally noted that this juror’s work history and present employment was that of somewhat manual labor, forklift operator. And again, with the realities of the case we had before us, Judge, with technical, sophisticated DNA evidence, that was not the kind of juror we were looking for.
“We also noted in Questions 22 and 23 that this juror was actually a witness to a murder and that her brother was, in fact, murdered and he had been convicted several times of varying offenses before he was murdered.
“It was just our feeling this juror was a little too connected to the process, in the role of a witness or in the role of a family member having to do with a murder.
“And those were the — those were the reasons that we struck Juror Number 52.”
(RTR, R. 12-13.)
As to Juror no. 27, the State set out the following reasons:
“Next, Judge, would be Juror Number 27. And first and foremost that occurred to us was her employment, that being a packer on an assembly line at Target Distribution Center. Her previous employment was at Burger King [fast-food restaurant]. And that was something obviously that the State in its quest for jurors that possessed a little more sophistication either in a professional or a social sophistication, that was of some concern to us, as the kind of employment she had.
“I also noticed, Judge, in Question Number 79 at the very end of the questionnaire, when the question asks, ‘If you’ve heard anything in the media regarding this case, do you feel you could still be fair and impartial?’ And she circled no. That caused us concern.
“And of equal concern was the fact that according to our records she had been charged with what appears to be six counts of possession of marijuana in the second degree. It appeared that she had been convicted on at least one of *351 these counts. These cases arose back in 1990. Of some interest to me was the fact I was exclusively a drug prosecutor from ’88 until ’94, so I would have been in the office. She appeared to have lived here in Madison County, these charges came out of Madison County.
“And all of those were of concern to the State and that’s the reasons we struck Juror Number 27.”
(RTR, R. 14-15.)
Regarding Juror no. 11, the State explained:
“Judge, the next one would be prospective Juror Number 11. And the reasons that the State struck her, first, we noted she too was Seventh Day Adventist. For the reasons earlier stated, she was not desirable to us.
“We also noticed in her employment questions, specifically Number 6, that she had been — she was unemployed. And when asked previous work experience for the last 10 years, she had none. It asked what her husband’s work was. Apparently she had an ex-husband. And when asked what work he did she said unknown.
“And again, in the employment area, in light of the evidence we were presenting that was not a desirable juror to us.
“In Question Number 79, she didn’t give an answer in Question Number 79 about media and whether she could be fair and impartial.
“We had noted that she did have a conviction for issuing a worthless check through our records.
[[Image here]]
‘Well, she didn’t fully answer Number 74. And, Judge, those were the reasons that the State struck Juror Number 11.” (RTR, R. 15-16.)
The State noted that it struck Juror no. 64 for the following reasons:
“The next, Judge, would be Juror Number 64. The first thing we noted was that this juror had served on three juries in the previous six years before the trial in the incident case. One of those cases had resulted in a not guilty verdict. We noted when this juror filled out her questionnaire, when some of the principles] of the criminal law was discussed that she had circled reasonable doubt in Question 50. And on Question 55 also asked if there was any other information. And she said, T’m a great person.’ And in general, Judge, our feeling was — our feeling was that she was, for lack of a better term, a little bit too much of a somewhat arrogant, professional juror. Because in general voir dire she was fairly verbal in that process asking about whether the death penalty has appeals. She was just — she was pretty vocal. And the fact that she had had prior service seemed to be, again, for the lack of a better word, seemed to be somewhat of a professional juror. One of those prior juries she had returned a not guilty.
“We also noted that this juror was a nurse. As the Court well remembers, the victim in this case was a nurse, as was one of our key witnesses. And we were of the opinion that to risk a juror second guessing what a key witness in our case, Nurse Kim Heliums had done in the hospital, was something to be avoided.
“And Juror Number 64 was struck for those reasons.”
(RTR, R. 16-17.)
Regarding Juror no. 38, the State provided:
“The next one, Judge, would be Juror Number 38. One of the first things we noticed on this was this particular juror’s checkered employment history, *352 that she was presently working as a car rental agent and had only been on the job for two weeks. And from her employment history section, Question 17, she had never been at any employer for more than three months. So it appeared to total roughly seven months of work in the last 10 years. She did not appear to be sophisticated to us in filling out her questionnaire, in that she misspelled Wal-Mart as one of her previous employers as Wal-Marts.
“There was some questions she did not answer such as Question Number 50. She said she knew some attorney in Michigan, but not much — in Question Number 26, but not much more information than that. And what was noted from my seating chart, Judge, is that this particular juror appeared to me to be somewhat inattentive and disinterested during the voir dire process.
“And for those reasons we struck Juror Number 38.”
(RTR, R. 17-18.)
As to Juror no. 47, the State explained:
“Judge, our next one would be Juror Number 47. And the first thing we noted was again in the area professional or social sophistication, that this lady was a cafeteria manager, that her husband was a security guard, that she had answered some questions, and I’m not trying to lead the Court to believe she’s the only one who messed up these answers, because there were a number of people on the panel, and some that remained on the jury that, too, had trouble with some questions such as Question Number 50, if the burden should be beyond all doubt for the State and she said yes. That the defendant — in Question 58, that the defendant should be required to testify.
“And then we got to the area of media exposure and she was — she was in — we noted in her questionnaire that she said she never watched TV. And then in the general voir dire she had said that she had seen some media exposure of this case. And then we further voir dired her in individual voir dire, and I made a note on my seating chart that as a result of that she said she could be fair, but as a result of that questioning, I don’t know if it was specifically that question, but I detected a hostility on her part just in general. Didn’t know if she wanted to be here.
“But between that, that I noted about her, the fact that her sophistication level was somewhat suspect in our opinion and we had uncovered she had also had an issuing a worthless check, it was for those reasons, Judge, that we struck Juror Number 47.”
(RTR, R. 19-20.)
Finally, regarding Juror no. 74, the State provided:
“Judge, the next one would be Juror 74. In reviewing her questionnaire we noted at Question 20 that she had had previous jury service, one involving a capital murder charge where the defendant received a sentence of life without parole. That was of some interest to us and we were not — obviously we were seeking the death penalty in this case, we were not looking for any expert jurors or seasoned jurors in this case.
“In fact, when you look at the twelve that remained on the jury only one juror had ever served on a jury and it was 45 [sic] years before this case, roughly, back in the ’70s according to him.
“We also noticed here on Juror Number 74 that her occupation was a secretary. That in the questionnaire on Question Number 67 it says, ‘Do you agree that the indictment charging capital murder is only a formal charge and *353 has nothing to do with guilt or innocence?’ She says, ‘No.’
“Question 74 we noted that she didn’t — she didn’t explain her answer. We also noted that her son in Question 23 was the victim of two robberies, both being obviously a violent crime, and that no arrest or convictions were had in that case.
“And, Judge, it’s for those reasons that we struck Juror Number 74.”
(RTR, R. 21-22.)
During the Batson hearing, the trial court inquired about the State’s strike of Juror no. 38 based on her employment history, specifically asking if the prosecutor knew that Juror no. 38 was retired— the prosecutor indicated that he did not know that Juror no. 38 was retired. Additionally, the prosecutor explained the “lack-of-sophistication” reason he had given for striking several African-Americans as follows:
“[W]ith respect to professional or social sophistication, Judge, I will note for the Court that when you do look at the jurors who remained on this case, the Court will find that they were all professionals or of management level, with the exception of one lady who was a housewife but married to a guy who worked at Dunlop Tire who had appeared in court as an expert witness. And this lady also had two children who were both educated.
“And it was the State’s intent, as I said earlier, that with the level of technical jury that this — or technical evidence that this jury was going to have to confront that that was one of the main concerns of the State in this case, to, in fact, get a jury that could comprehend DNA evidence. As the Court remembers the defense put up a DNA expert in this case. And the defense had actually sent the DNA evidence to two other independent labs, so we were not sure exactly what may be confronting us. Obviously we had DNA testimony from Rodger Morrison at [the Department of Forensic Sciences].”
(RTR, R. 20-21.)
Following the hearing, the trial court entered the following order:
“This matter having come before the Court on remand from the Alabama Court of Criminal Appeals, this court having been directed to conduct a hearing to determine if the State improperly used its peremptory jury challenges against African-American venire members in a manner such as to violate Batson v. Kentucky, 476 U.S. 79 (1986), the Court having conducted such a hearing on April 27, 2010, the court having considered the reasons offered by Madison County District Attorney ... as to the use of the State’s peremptory challenges, the court having reviewed the transcript of the voir dire and the jury questionnaires, the court having further reviewed the Defendant’s Rebuttal to Prosecutor’s Reasons for Striking Black Jurors, the court makes the following findings of fact and conclusions of law:
“ Juror No. 55
“The State offered the following reasons for having used a peremptory challenge to remove this juror:
“1. This prospective juror was opposed to the death penalty.
“2. This prospective juror was a social services case worker. This prospective juror dealt with victims’ abuse and was a witness in many cases.
“3. This prospective juror knew one of the defendant’s counsel.
“4. This prospective juror knew the trial judge.
“5. This prospective juror’s son was the victim of an attempted murder for *354 which there had never been a prosecution.
“The court has examined the record and noted that Juror No. 55 stated that she ‘wouldn’t want to impose’ the death penalty but that she thought she could ‘go along with it’ under certain circumstances. (R. 292.) While this juror did not initially indicate that she was acquainted with defense counsel ... or the undersigned judge, she later admitted to these associations in response to direct questioning. (R. 80; 29; 298.) The record also supports the State’s contention that her son had been the victim of an attempted murder. Moreover, as a [Department of Human Resources] social worker, this prospective juror acknowledged that she has ‘seen a lot’ of abuse over the years. (R. 189.)
“Alabama courts have previously held that a juror’s mixed feelings or reservations about imposing the death penalty in a capital case is a valid race-neutral reason to exercise a peremptory challenge. Acklin v. State, 790 So.2d 975 (Ala.Crim.App.2000). In addition, the courts have upheld challenges in cases where a juror was struck because he or she had a family member who was the victim of a violent crime. Given the totality of the circumstances in this case, the reasons offered by the State with regard to this juror are neutral, non-race-related reasons.
“ Juror No. 37
“The State’s prosecution offered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror was opposed to the death penalty.
“2. This prospective juror did not answer various questions on the questionnaire.
“3. This prospective juror is a custodian and therefore may not be sufficiently sophisticated to serve on this jury.
“Upon review of the record and based on this Court’s personal observations, Prospective Juror No. 37 expressed strong reservations about his ability to impose the death penalty. In fact, this juror was arguably one of the most impassioned persons regarding his views, stating that he ‘would not be able to live with himself if [he] had something to so with someone going to the electric chair....’ (R. 287.) Given the colloquy which took place and this juror’s obviously mixed feelings at having to serve as a juror in this case, the court finds that the reason proffered by the State was a valid race-neutral reason. Ackliin v. State, 790 So.2d 975 (Ala.Crim.App.2000).
“The court has reviewed the jury questionnaire and agrees with the State that this juror failed to respond to several of the questions asked. These questions involved issues regarding weighty constitutional and legal principles. Alabama courts have previously held that a lack of response is a valid race-neutral reason for striking a venire-member. Hocker v. State, 840 So.2d 197 (Ala.Crim.App.2002). The court finds the proffered reason to serve as a further race-neutral reason in this case.
“The court finds insufficient evidence was presented to show that this prospective juror was too unsophisticated to serve as a juror in this case. Although he failed to respond to questions asked in the questionnaire, no evidence was presented that this omission was a product of his inability to comprehend the questions posed. Moreover, his occupation as a custodian, standing alone, is insufficient to establish his lack of sophistication.
*355 “However, given the fact that this was not the sole reason upon which the State exercised its peremptory challenge, the court finds that the use of the peremptory challenge with regard to this juror not to be racially motivated.

“Juror No. 65

“The State’s prosecution offered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror’s opinion about the death penalty.
“2. This prospective juror’s family obligations interfered with his ability to serve.
“The record reflects that this juror wrote ‘vengeance is mine sayeth the Lord’ in response to a question regarding the death penalty. He stated that he could conceive of no circumstance under which he could impose the death penalty and then equivocated and stated ‘[Mjaybe sir. I’m not a hundred percent.’ (R. 226.)
“Based on the responses given by this prospective juror and the court’s observation, the court finds that the reason given by the State for the use of this peremptory strike to be a valid, race-neutral reason. Acklin v. State, 790 So.2d 975.
“Of lesser significance was the fact that this juror indicated that he had a potential family conflict. Such a reason has been held to be a race-neutral reason. Brown v. State, 623 So.2d 416 (Ala. Crim.App.1993).
“The court finds that in this case, the use of the peremptory strike against this juror was not race-motivated.

“Juror No. 39

“The State’s prosecution offered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror was a Seventh Day Adventist and this trial was potentially scheduled to take place on a Saturday.
“2. This prospective juror was unemployed.
“3. This prospective juror has a relative involved in prison ministries.
“4. This prospective juror’s questionnaire was incomplete.
“5. This prospective juror indicated that he could not be fair.
“This juror indicated that he could not engage in any activities other than religious activities on Saturdays because of his religious belief. (R. 209). As noted previously, outside obligations of a prospective juror, especially one of a religious nature, are a sufficiently neutral non-race-related reason to use a peremptory challenge. Brown[,] 623 So.2d at 416. Similarly, religious-based strikes have also been deemed to be race-neutral, Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007). The court finds that sufficient evidence existed to support the use of a peremptory challenge with regard to this juror.
“The fact that this juror was unemployed, standing alone, may not constitute a sufficient reason for striking this juror. However, given the validity of the other stated reasons, the court finds no racially motivated animus in the use of this peremptory challenge.

“Juror No. 52

“The State offered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror was a Sabbath Keeper.
“2. This prospective juror was studying to become a minister.
*356 “3. This prospective juror’s brother was murdered and prior to his murder, he had engaged in criminal conduct.
“4. This prospective juror had witnessed a murder and was ‘too connected with the process.’
“5. This juror lacked sophistication in light of the technical evidence to be presented.
“Juror No. 52 asked to speak to the court and counsel privately. She revealed that she had been victim of an ‘almost rape.’ (R. 211-212.) She witnessed a murder. (R. 212.) Her brother had a criminal history and was murdered. No one was ever prosecuted for that crime. (R. 212-213.)
“The fact that a juror or a juror’s family member was the victim of a crime is a sufficient race-neutral reason. Tinker v. State, 932 So.2d 168 (Ala.Crim. App.2005).
“This juror’s religious affiliation was also cited as a reason for the use of a peremptory challenge and the court finds this reason to be race-neutral.
“The stated reasons that this juror’s work history was not conducive to serving as a juror in this case is not supported by the information conveyed at trial. Nonetheless, the totality of the reasons given supports the finding that the State did not improperly strike this juror.

“Juror No. 27

“The State proffered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror’s employment history indicated a lack of sophistication.
“2. This prospective juror had been charged and convicted of drug possession.
“3. The District Attorney had a belief that he may have served as the prosecutor on her case.
“A strike based on information on a prospective juror’s criminal history has been held to be race-neutral. Ex parte Brown, 686 So.2d 409 (Ala.1996). In this case, the District Attorney also noted that he likely served as the prosecutor on the ease but this juror never indicated that she recognized him. These reasons supported her removal as a juror.
“The District Attorney also indicated that this juror was not sophisticated. Based on the court’s observations and the responses given on this case, the trial court finds this to be a race-neutral reason.

“Juror No. 11

“The State offered the following reasons for having used a peremptory challenge against this juror:
“1. This prospective juror was a Seventh Day Adventist.
“2. This prospective juror’s current work status and previous employment.
“3. This prospective juror provided insufficient responses to the questions asked.
“4. This prospective juror has a worthless check conviction.
“As stated previously in this order, a juror’s criminal conviction, religious affiliation, and evasiveness are all race-neutral reasons for the use of a peremptory strike. Moreover, this juror indicated that she had not been employed in ten years. While her current unemployment, standing alone, may not have been a sufficiently race-neutral reason, when compiled with the other factors enunciated by the District Attorney, the reasons stated were sufficient.

“Juror No. 61

*357 “At the hearing in this case, the State indicated that Juror No. 64 was struck because:
“1. This prospective juror served on three juries in six years and in at least one of those cases, the jury reached a ‘not guilty’ verdict.
“2. This prospective juror appeared arrogant and vocal, giving the appearance of being a ‘professional juror.’
“3. This prospective juror was a nurse, the same profession as the victim in this case and a key witness.
“4. This prospective juror made a questionable notation in her questionnaire answer.
“The fact that a juror has served on a prior case in which a ‘hung jury resulted has been held to be a race-neutral reason. Trawick v. State, 698 So.2d 151 (Ala.Crim.App.1995). Moreover, this court had the opportunity to observe the demeanor of this juror. The fact that the juror was employed as a nurse and that the State was concerned that she may be critical of steps taken by other health care providers in collecting evidence in this case also apparently factored into the State’s decision to strike this juror. These stated reasons were race-neutral.

“Juror No. 38

“The reasons cited for the use of a peremptory strike to remove this prospective juror from the jury venire include:
“1. This prospective juror’s employment history.
“2. This prospective juror’s lack of sophistication.
“3. This prospective juror’s lack of responses.
“4. This prospective juror’s inattentiveness.
“This court had the ability to observe this prospective juror’s demeanor and participation in the voir dire process. Based on this court’s recollection, the State’s proffered reason for striking this juror for ‘inattentiveness’ was justified. See Woods v. State, 724 So.2d 40 (Ala. Crim.App.1997). In addition, the fact that she failed to complete her jury questionnaire was a race-neutral reason for striking this juror.
“With regard to the State’s claim that this juror lacked sophistication in filling out her questionnaire, this court finds that the fact that she misspelled a word does not necessarily indicate a lack of sophistication. However, when coupled with her employment history and her demeanor, the court finds that the use of peremptory strike by the State was race-neutral.

“Juror No. ⅛7

“The reasons given by the State for the use of its peremptory challenge with regard to this juror include:
“1. This prospective juror’s lack of sophistication.
“2. Concerns about this prospective juror’s veracity.
“3. This prospective juror’s display of hostility.
“4. This prospective juror’s criminal history for issuing worthless checks.
“A perceived lack of sophistication of a prospective juror when faced with technical expert evidence in a case has been held to constitute a race-neutral reason for the use of a peremptory challenge. T.K.S. v. State, 673 So.2d 429 (Ala.Civ.App.1995). The court had an opportunity to observe this juror and her demeanor. The court finds that the District Attorney’s stated reason for striking this juror based on her perception that she was hostile is a valid, race-neutral reason. See Brown v. State, 623 *358 So.2d 416 (Ala.Grim.App.1993). Finally, as noted previously in this order, the fact that this juror had a criminal conviction also justified the State’s use of a peremptory challenge.

“Juror No.

“The State contended that it used a peremptory challenge to remove this veniremember because of the following:
“1. This prospective juror served on a prior case involving capital murder and the Defendant received a life sentence.
“2. This prospective juror’s son was the victim of two robberies.
“3. This prospective juror was employed as a secretary.
“4. The State questioned the prospective juror’s response to the one of the questions contained in the questionnaire.
“As stated previously in this order, the fact that a juror served on a prior jury which returned a verdict which was less than favorable to the prosecution is a race-neutral reason. Such is the case here. Moreover, the fact that the juror’s son was the victim of two violent crimes also justified the State’s removal of this juror from the jury.
“The fact that this juror is employed as a secretary is not clearly a race-neutral reason but based upon the other articulated reasons, this juror was not struck for any improper reason.
[[Image here]]

“Conclusion

“The court finds that as set forth in this Order, the State demonstrated valid, race-neutral reasons for the use of its peremptory challenges with regard to the jury venire in this case. Those reasons which the court found to be valid were not a function of pretext or sham and this Court further finds that no further relief is due to be afforded to the Defendant in this case.”
(RTR, R. 104-11.)
Evaluation of a Batson claim involves the following three steps:
“ ‘First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97 [(1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.’ ”
McCray v. State, 88 So.3d 1, 17 (Ala.Crim.App.2010) (quoting Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).
In Ex parte Sharp, the Alabama Supreme Court held that the record raised an inference of discrimination. 151 So.3d at 342. Thus, the first step of the Batson process — a prima facie case of discrimination — has been established.
Under the second step of the Batson process, the burden shifts to the prosecution to offer a race-neutral reason for striking the juror or jurors in question. Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987). See, e.g., Ex parte Bird, 594 So.2d 676, 680 (Ala.1991). The prosecution must provide “a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory.” Ex parte Branch, 526 So.2d at 623. See also Ex parte Bird, 594 So.2d at 680. The reason for the strike, however, need not rise to the level of a strike for cause, and the issue is the facial validity of the prosecutor’s explanation. Ex parte Branch, 526 So.2d at 623; *359 Doster v. State, 72 So.3d 50, 73 (Ala.Crim.App.2010).
The trial court here held that the State met its burden under the second stage of the Batson inquiry to articulate a “facially neutral” reason for excluding prospective African-American jurors.
“ ‘Within the context of Batson, a “race-neutral” explanation “means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). “In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.” Id. “[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within [a] trial judge’s province.’ ” Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.’
“Allen v. State, 659 So.2d 135, 147 (Ala. Crim.App.1994) (emphasis added). See also Rogers, 819 So.2d at 649. ‘ “The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.” ’ Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App. 2007) (quoting Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991)). Thus, ‘ “ ‘[o]n appeal, the trial court’s ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it is clearly erroneous.’ ” ’ Harris, 2 So.3d at 899 (quoting Harrison v. State, 879 So.2d 594, 607 (Ala.Crim.App.2003) (quoting in turn Ex parte Brooks, 695 So.2d [184] at 190 [ (Ala.1987) ])). ‘ “ ‘A finding is “clearly erroneous” when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’ ” ’ Fletcher v. State, 703 So.2d 432, 436 (Ala.Crim.App.1997) (quoting Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989) (quoting in turn Powell v. State, 548 So.2d 590, 594 (Ala.Crim. App.1988), aff'd, 548 So.2d 605 (Ala.1989))).
[[Image here]]
“... It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). ‘Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ Battle v. State, 574 So.2d 943, 949 (Ala.Crim.App.1990).”
Martin v. State, 62 So.3d 1050, 1058-60 (Ala.Crim.App.2010).
We agree with the trial court’s conclusion that the State provided facially race-neutral reasons for striking the 11 African-American jurors and that it therefore satisfied its burden under step two of the Batson process. Both the Alabama Supreme Court and this Court have specifically recognized as race neutral the reasons asserted by the State here, such as *360 opposition to the death penalty; the fact that the prospective juror had been the victim of a crime or had a relative who had been the victim of a crime; the failure to answer questions on a juror questionnaire; religious beliefs or practices; prior convictions; lack of mental acuity; evasiveness or inattentiveness to questioning; service on a prior case in which the outcome had been less than favorable for the State; demeanor; bias; and unemployment.[5]
In the third step of the process, the defendant has the opportunity to offer evidence indicating that the reason or explanation offered by the State for challenging the juror in question is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. Throughout the Batson process, “[t]he defendant maintains at all times ... the ultimate burden of proving intentional discrimination.” United States v. Houston, 456 F.3d 1328, 1335 (11th Cir.2006) (citing Batson, 476 U.S. at 94 n. 18.
In light of both parties’ submissions, the trial court must determine whether the defendant has carried his or her burden of showing purposeful discrimination. See Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997); Ex parte Branch, 526 So.2d at 624. See also Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App.1997) (“When the defendant challenges as pre-textual the prosecutor’s explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991).”). In making that determination, the trial court must confront the “decisive question” and evaluate the credibility of the prosecution’s explanation, Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), “in light of all evidence with a bearing on it,” Miller-El v. Dretke, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). See also Miller-El v. Cockrell, 537 U.S. at 338-39; Batson, 476 U.S. at 98. Cf. Greene v. Upton, 644 F.3d 1145, 1155 (11th Cir.2011) (“Batson does not require elaborate factual findings. See Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 1035, 154 L.Ed.2d 931 (2003); see also Hightower v. Terry, 459 F.3d 1067, 1072 n. 9 (11th Cir.2006) (‘We may therefore make ’ “the common sense judgment” — in light of defense counsel’s failure to rebut the prosecutor’s explanations and the trial court’s ultimate ruling — that the trial court implicitly found the prosecutor’s race-neutral explanations to be credible, *361 thereby completing step three of the Bat-son inquiry.’)”)- In addition, “ ‘[t]he explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor’s other peremptory strikes, and as well, in light of the strength of the prima facie case.’ ” Ex parte Bird, 594 So.2d 676, 683 (Ala.1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See, e.g., Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (“[I]n reviewing a ruling claimed to be a Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.”).
“Under Alabama law, the trial judge must ‘evaluate] the evidence and explanations presented’ and ‘determine whether the explanations are sufficient to overcome the presumption of bias.’ Branch, 526 So.2d at- 624. ‘The trial judge cannot merely accept the specific reasons given ... at face value; the judge must consider whether the facially neutral explanations are contrived to avoid admitting the acts of group discrimination.’ Id.”
Smith v. Jackson, 770 So.2d 1068, 1072-73 (Ala.2000).
The Alabama Supreme Court in Ex parte Branch provided the following illustrative examples of the types of evidence the defendant could offer to demonstrate that the stated reason for challenging the juror in question is a sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck.
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the veni-re.
“6. ‘An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State ], 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific' questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
Ex parte Branch, 526 So.2d at 624 (citations omitted).
In reviewing the trial court’s ultimate conclusion on discriminatory intent, we apply the “clearly erroneous” standard of review. Hernandez, 500 U.S. at 364; Yancey v. State, 813 So.2d 1, 3 (Ala.Crim. App.2001). See also Greene, 644 F.3d at 1155. This deferential standard of review is applicable because intent to discriminate is a question of fact. Hernandez, 500 U.S. at 366-67. In Snyder, 552 U.S. at 477, the United States Supreme Court stated the following regarding the deferential standard of review applied to a trial court’s determination regarding discriminatory intent:
“On appeal, a trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See Hernandez v. New York, 500 *362 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395, (1991) (plurality opinion); id., at 372, 111 S.Ct. 1859, (O’Connor, J., joined by Sealia, J., concurring in judgment). The trial court has a pivotal role in evaluating Batson claims. Step three of the Batson inquiry involves an evaluation of the prosecutor’s credibility, see 476 U.S. at 98, n. 21, 106 S.Ct. 1712 and ‘the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,’ Hernandez, 500 U.S. at 365, 111 S.Ct. 1859 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often invoke a juror’s demeanor (e.g., nervousness, inattention), making the trial court’s first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie “peculiarly within a trial judge’s province,” ’ ibid. (quoting Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)), and we have stated that ‘in the absence of exceptional circumstances, we would defer to [the trial court].’ 500 U.S. at 366, 111 S.Ct. 1859.”
552 U.S. at 477, 128 S.Ct. 1203. Similarly, this Court has stated:
“‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.[’] Woods v. State, 789 So.2d 896, 915 (AIa.Crim.App. 1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim. App.1990).
“ ‘Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will “largely turn on evaluation of credibility.” 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lie “peculiarly within a trial judge’s province.” Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).’
“Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).”
Doster, 72 So.3d at 73-74 (emphasis added). See also Bryant v. State, 951 So.2d 732, 740 (Ala.Crim.App.2003).
The third step of the Batson analysis has been further explained:
“The reasons stated by the prosecutor provide the only reasons on which the prosecutor’s credibility is to be judged. United States v. Houston, 456 F.3d *363 1328,1335 (11th Cir.2006). The credibility of the prosecution’s explanation is to be evaluated considering the ‘totality of the relevant facts,’ including whether members of a race were disproportionately excluded. Hernandez [v. New York ], 500 U.S. [352] at 363, 111 S.Ct. at 1868 [ (1991) ] (quotation marks and citation omitted). Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor’s explanation for a strike is equally applicable to jurors of a different race who have not been stricken, Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir.1998); (2) upon a comparative analysis of the jurors struck and those who remained, Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir.1997), including the attributes of the white and black venire members, Houston, 456 F.3d at 1338; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned, Miller-El [v. Dretke ], 545 U.S. [231] at 246, 125 S.Ct. at 2328 [ (2005) ]. Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve. See id. at 241, 125 S.Ct. at 2325. A prosecutor’s reasonable explanation for objecting to a black panelist based on his or her opinions or comments may be undercut by the prosecution’s failure to object to other white panelists who expressed similar views, and may be evidence of pretext. Id. at 248, 125 S.Ct. at 2329-30. The prosecutor’s failure to strike similarly situated jurors is not pretextual, however, ‘where there are relevant differences between the struck jurors and the comparator jurors.’ United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001). The prosecutor’s explanation ‘does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.’ Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74, 163 L.Ed.2d 824 (2006) (quotation marks and citation omitted). Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides ‘clear and convincing’ evidence of pretext. McNair [v. Campbell], 416 F.3d [1291] at 1311-12 [(11th Cir.2005) ].”
Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir.2009) (emphasis added). See also United States v. Walker, 490 F.3d 1282, 1294 (11th Cir.2007) (providing that because the “trial judge is in the best position to evaluate an attorney’s candor and ferret out purposeful discrimination,” an appellate court will defer to trial court’s findings on genuineness of reasons even when “troubled by the weakness of record evidence”). The evaluation of the credibility of the prosecutor’s explanation in the third step demands consideration of the totality of the relevant facts, and we defer to a trial court’s findings as to the “genuineness” of the prosecutor’s proffered reason or reasons. See, e.g., Snyder, 552 U.S. at 477; Walker, 490 F.3d at 1294.
“The objecting party may carry its burden by showing that the striking party’s race-neutral reason is a mere pretext for discrimination.” United States v. BemaV-Benitez, 594 F.3d 1303, 1312 (11th Cir. 2010). As noted above, one way the defendant may demonstrate that the offered reason is a pretext is to show that it applies with equal force to veniremembers of another race who were not struck. Miller-El v. Dretke, 545 U.S. at 241.
*364 Here, as noted, the prosecution offered multiple reasons in support of its strikes of the jurors in question (Jurors no. 55, 37, 65, 39, 52, 27, 11, 64, 38, 47, and 74). In the trial court and in his materials to this Court, Sharp attacks many of the prosecution’s stated reasons for striking those jurors. Indeed, for most of those jurors, Sharp has offered reasons arguably demonstrating that one or more of the prosecution’s stated reasons for striking that juror could be viewed as a sham or a pretext. Under our well settled case law, however,
“ ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made,’.... [and] ‘[w]here a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ ”
Martin, 62 So.3d at 1059-60 (emphasis added; citations and quotation omitted).[6] *365 Sharp has not demonstrated, as to any individual juror in question, that all the stated reasons for striking that juror were a sham or a pretext. Thus, Sharp has not demonstrated that the prosecution violated Batson.

Jurors no. 38, 47, 37, and 71¡.

In the trial court, Sharp challenged the prosecution’s striking Jurors no. 38, 47, 87, and 74 for allegedly lacking “sophistication.” Sharp pointed out that the State did not strike two Caucasian jurors who also appeared to lack “sophistication” or “intelligence” but who sat on Sharp’s jury. The trial court, however, did not rely solely on the “laek-of-sophisti-cation” reason in its order as to Jurors no. 38, 47, 37, and 74.[7] Rather, as Martin permits, the trial court cited other race-neutral reasons the State offered for striking Jurors no. 38, 47, 37, and 74.
Specifically, the prosecution explained (1) that Juror no. 38 appeared inattentive and failed to complete the jury questionnaire; [8] (2) that Juror no. 47 appeared to be hostile and had a prior criminal conviction; (3) that Juror no. 37 expressed strong reservations about the death penalty and failed to complete the jury questionnaire; and (4) that Juror no. 74 had served on a prior jury that had returned a less-than-favorable verdict for the State and also had a relative who had been the victim of a violent crime.
The trial court, which was in the best position to judge the demeanor of the veniremembers, entered findings in agreement with the reasons given by the State. Specifically, the trial court indicated (1) that it had observed Juror no. 38’s demeanor and that Juror no. 38 was inattentive during the voir dire process; (2) that *366 it had observed Juror no. 47’s demeanor in a display of hostility by Juror no. 47; (3) that Juror no. 87 had indicated his inability to impose the death penalty; and (4) that Juror no. 74 had returned a verdict unfavorable to the State in a prior case. In addition, the fact that Juror no. 74’s son had been a victim of a crime was also a valid basis for exercising a peremptory challenge to remove Juror no. 74. Accordingly, the trial court did not clearly err in its determination that the State did not engage in purposeful discrimination in striking Jurors no. 38, 47, 37, and 74.

Jurors no. 27 and 11

Sharp takes particular exception to the prosecution’s strikes of potential Jurors no. 27 and 11 because, he says, the State struck these jurors because they lacked “sophistication.” The State also asserted, however, that it struck Juror no. 27 because she had been charged in Madison County with six counts of possession of marijuana and had been convicted on at least one of those counts; the State further asserted that the district attorney prosecuting Sharp’s case had served exclusively as a prosecutor of drug cases during that time and likely prosecuted Juror no. 27’s case. These are valid race-neutral reasons. See Brown v. State, 982 So.2d 565, 586 (Ala.Crim.App.2006) (holding that the prosecutor’s reason for exercising peremptory strikes against three African-American veniremembers who had criminal convictions and who each had failed to respond when questioned as to whether they had any prior convictions, was race neutral for purposes of capital-murder defendant’s Batson challenge); Gamble v. State, 791 So.2d 409, 424-25 (Ala.Crim. App.2000) (stating that the State’s peremptory strike of a prospective juror who had been prosecuted by the same district attorney’s office numerous times for writing worthless checks and for possession of marijuana did not result in a Batson violation). See also Carter v. State, 249 Ga. App. 354, 356, 548 S.E.2d 102, 105 (2001) (determining that under Batson the State offered a race-neutral explanation for exercising a peremptory strike against an African-American prospective juror where the juror failed to disclose a shoplifting conviction for which she had been prosecuted by the same district attorney prosecuting the defendant’s case). Cf. Parker, 565 F.3d at 1271 (“Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides ‘clear and convincing’ evidence of pretext.”).
As to Juror no. 11, the State asserted that, “through its records,” it had noted that Juror no. 11 had also been convicted in Madison County of negotiating a worthless check, a crime of moral turpitude.[9] This is a valid race-neutral reason. See Hall v. State, 816 So.2d 80 *367 (Ala.Crim.App.1999) (having had “contact” with the bad-check unit of a prosecutor’s office is a race-neutral reason for striking a juror); Siler v. State, 629 So.2d 33 (Ala. Crim.App.1993) (providing that a prospective juror was properly struck pursuant to the prosecutor’s belief that the juror had been prosecuted for passing bad checks); Childers v. State, 607 So.2d 350 (Ala.Crim. App.1992) (concluding that a venire-member was properly struck where the prosecutor stated that he was currently in the process of prosecuting the venire-member in a bad-check case); Bryant v. State, 516 So.2d 938 (Ala.Crim.App.1987) (determining that a potential juror was properly struck by the prosecutor because the challenged juror had written bad checks).
Sharp claims he showed disparate treatment in the State’s striking of Jurors no. 27 and 11, African-Americans who had prior convictions and in its failure to strike Juror no. 24, a Caucasian who sat on Sharp’s jury despite stating on his questionnaire that he had previously been convicted of assault. We disagree.
This Court has recognized that for disparate treatment to exist, the persons being compared must be “otherwise similarly situated.” Yancey, 813 So.2d at 7 (quotation omitted). In this case, Jurors no. 27 and 11 were not similarly situated to Juror no. 24. As noted, Juror no. 24, unlike Jurors no. 27 and 11, disclosed on his juror questionnaire that he had a prior conviction: an assault conviction in 2000 in Mem *368 phis, Tennessee. Jurors no. 27 and 11, however, did not disclose on their juror questionnaires that they had prior convictions. Juror no. 27 simply answered “no” to the question, and Juror no. 11 indicated only that her brother had been convicted of a crime. Our caselaw recognizes the fundamental importance of truthful responses from prospective jurors. See, e.g., Tomlin v. State, 695 So.2d 157, 169 (Ala. Crim.App.1996) (“ ‘It is fundamental to our system of impartial justice that “ ‘[pjarties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.’ ” ’ ” (quoting State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App.1992), quoting in turn Ex parte O’Leary, 438 So.2d 1372, 1373 (Ala.1983), quoting in turn Ex parte O’Leary, 417 So.2d 232, 240 (Ala.1982))). Not only did Jurors no. 27 and 11 fail to disclose that they had prior convictions (which had occurred in Madison County), they also failed to indicate on their juror questionnaires that they had previous involvement as criminal defendants with law enforcement in Madison County. Juror no. 24, however, disclosed on his questionnaire that his only involvement with law enforcement in Madison County was as a citizen — specifically, in his capacity as manager of a local department store. In light of the State’s belief that Jurors no. 27 and 11 had prior convictions, the failure of Jurors no. 27 and 11 to disclose that they had prior convictions or any involvement with Madison County law enforcement renders them not “similarly situated” to Juror no. 24 for purposes of a disparate-treatment analysis.[10]
Sharp also claims that the State failed to engage in meaningful voir dire with Jurors no. 27 and 11 about their prior undisclosed convictions. Although the State’s failure to engage in meaningful voir dire may in some cases be “evidence that the explanation is a sham and a pretext for discrimination,” Hemphill v. State, 610 So.2d 413, 416 (Ala.Crim.App.1992), the trial court did not clearly err in its conclusion under the circumstances here.
Both the State and the defense had juror questionnaires during jury selection. One purpose for using juror questionnaires is to obtain specific information from each potential juror without having to take days to conduct oral voir dire and without duplication of questions. Once the State discovered that a discrepancy existed between the public records of conviction and the sworn responses provided by Jurors no. 27 and 11, it would have been apparent to the State that Jurors no. 27 and 11 had not been truthful in answering their juror questionnaires. For the State to have then questioned Jurors no. 27 and 11 about those prior convictions, which Jurors no. 27 and 11 had not disclosed even though they were matters of public record, likely would have embarrassed Jurors no. 27 and *369 11 in front of the other veniremembers. To so question and embarrass one member of the venire in front of other members of the venire would likely have had a chilling effect on the other jurors’ freely answering voir dire questions. It could even have resulted in potential jurors becoming embittered toward the prosecutor for having embarrassed a fellow veniremember. Thus, because of the State’s knowledge of the prior convictions and the failure of Jurors no. 27 and 11 to answer truthfully on the questionnaires, voir dire on this topic likely would not have been “meaningful.” [11]
As this Court noted in Brown v. State, 982 So.2d 565, 584-85 (Ala.Crim.App.2006):
“ ‘ “A connection with or a founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the.exercise of a preemptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991); Powell v. State, 548. So.2d 590 (Ala.Crim.App.1988), aff'd on other grounds, 548 So.2d 605 (Ala.1989); Lynn v. State, 548 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). This connection with or suspicion of criminal activity includes the juror in question, as well as close relatives and friends of the juror. Stephens; Allen v. State, 555 So.2d 1185 (Ala.Crim.App.1989); Lynn.” ’
“Baker v. State, 906 So.2d 210, 255 (Ala. Crim.App.2001), rev’d on other grounds, 906 So.2d 277 (Ala.2004), quoting Heard v. State, 584 So.2d 556, 560 (Ala.Crim. App.1991). -See also McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004) (‘Peremptory strikes based on the criminal record of a prospective juror do not violate Batson. Darby v. State, 601 So.2d 117 (Ala.Crim.App. 1989).’).”
Accordingly, the trial court did not clearly err in determining that Sharp failed to demonstrate that the State’s proffered reasons for striking Jurors no. 27 and 11— prior undisclosed convictions and prior prosecution by Madison County law enforcement — were pretextual or otherwise a sham. As noted above, “[i]t is well settled that ‘/a/s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ ” Martin, 62 So.3d at 1059-60 (emphasis added; citations and quotation omitted). Further, “ ‘[wjhere a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ ” Id. (emphasis added). Thus, Sharp is not entitled to relief on his Batson claim as to Jurors no. 27 and ll.[12]

*370
Jurors no. 52, 39, 65, 55, and 6⅛

Sharp also argued that the prosecution did not strike other Caucasian jurors who were similarly situated to African-American jurors who were struck. For example, Sharp cites Juror no. 52, an African-American male, and Juror no. 79, a Caucasian male, who were both studying to become ministers, and Juror no. 39, an African-American male who was involved in prison ministries. Although the State explained that Juror no. 52 was studying to become a minister, it also stated that Juror no. 52’s brother had been murdered and that Juror no. 52 had witnessed the murder. The trial court found that Juror no. 52 privately revealed that she had been the victim of an “almost rape,” that she had a brother who had a criminal history, and that she had witnessed a murder. As to Juror no. 39, the prosecution articulated that he was a Seventh-Day Adventist involved in prison ministries, and the trial court found that his religious beliefs would have prevented him from “engag[ing] in any activities other than religious activities on Saturdays.” [13] (RTR, R. 107.)
Similarly, Sharp claims purposeful discrimination in the prosecution’s striking of Juror no. 65. Juror no. 65, however, strongly expressed that he could not impose the death penalty. The Caucasian jurors who were empaneled did not express the same response, and the trial court indicated this was a valid reason based on its observation of Juror no. 65. The trial court, which was in the best position to judge the demeanor of the veniremembers, made specific findings regarding these jurors. The materials before us do not demonstrate that the trial court’s determination was clearly erroneous.
Additionally, the prosecutor provided several reasons for striking Juror no. 55, and the trial court found that Juror no. 55: (1) wavered on the death penalty; (2) knew both defense counsel and the trial judge; (3) had a son who had been the victim of an attempted murder; and (4) worked as a social worker and had seen abuse during her employment. Although several Caucasian jurors who were empaneled indicated that either they or their relatives were victims of a crime, our review of the record indicates that none of *371 the Caucasian jurors that Sharp claimed to be similar to Juror no. 55 opposed the death penalty or knew any of the parties involved in Sharp’s case. We defer to the trial court’s findings as to the “genuineness” of the prosecutor’s proffered reasons, and there is no evidence indicative of an improper motive by the prosecutor in exercising the peremptory strike as to Juror no. 55.
Sharp also contends that the State engaged in purposeful discrimination in striking Juror no. 64. The trial court found that, after observing the demeanor of Juror no. 64, the State had not engaged in purposeful discrimination because, among other things, Juror no. 64 had previously served on a jury that had resulted in an unfavorable verdict. We do not see clear error in the trial court’s rejection of Sharp’s Batson claim as to Juror no. 64.
Finally, in accordance with Rule 45A, Ala. R.App. P., we have again searched the record for any error that may have adversely affected Sharp’s substantial rights, and we have found none.

Conclusion

As noted above, the reasons given by the State at the second step of the Batson analysis were sufficient to rebut the prima facie showing of racial discrimination. After reviewing the transcript of voir dire, the juror questionnaires, the proceedings on remand, and the briefs filed with this Court in accordance with the Alabama Supreme Court’s October 18, 2012, order, we conclude that the trial court did not clearly err in holding that Sharp failed to demonstrate that the State engaged in purposeful discrimination in violation of Batson. Indeed, the totality of the relevant facts supports the trial court’s determination that the prosecutor’s challenges were not based on race or ethnicity. See Snyder, 552 U.S. at 477. We therefore affirm the trial court’s denial of Sharp’s Batson claim.
APPLICATION FOR REHEARING GRANTED; OPINION OF MARCH 23, 2012, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WINDOM, P.J., and BURKE, J., concur. JOINER, J., concurs specially. WELCH and KELLUM, JJ., dissent, with writing by KELLUM, J., which WELCH, J., joins.

. On October 18, 2012, the Alabama Supreme Court vacated this Court’s judgment of March 23, 2012, and remanded the case for us to "allow the parties to brief the issues raised by the trial court's Batson [v. Kentucky, 476 U.S. 79 (1986),] order and ... address those issues by further opinion.” For the most part, our March 23, 2012, opinion addressed the issues Sharp raises in his most recent briefs to this Court, and our opinion today is largely a restatement of our March 23, 2012, opinion, with additional discussion necessitated by the Supreme Court's order.

. In its brief filed after the Alabama Supreme Court’s October 18, 2012, order, the State argues, among other things, that Sharp’s Bat-son claim is not properly before this Court because it was not raised at trial. The State made essentially the same argument to the Alabama Supreme Court when it was in the process of deciding Ex parte Sharp, but the court nonetheless addressed Sharp's plain-error Batson claim. Consequently, we agree with Sharp that the law-of-the-case doctrine precludes us from considering the merits of the State’s argument that Sharp's Batson claim is not properly before this Court. See, e.g., Clemons v. State, 123 So.3d 1, 12-13 (Ala.Crim.App.2012).

. Sharp is Caucasian. In Batson, the United States Supreme Court held that black venire-members could not be struck from a black defendant's jury because of their race, and in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court extended its decision in Batson to white defendants. See Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App. 1995).

. We set out the State’s reasons in the order in which the State provided them at the hearing.

. See, e.g., Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010) (opinion on return to remand), and the cases cited therein (mixed views on or reservations concerning capital punishment, previous criminal charges, prosecutions or convictions of prospective juror or family member, acquaintance with attorneys involved in the case, demeanor, and employment are all valid race-neutral reasons for peremptory strike); Stanley v. State, 143 So.3d 230 (Ala.Crim.App.2011), and the cases cited therein (prospective juror’s criminal history or relatives who have prior arrests or convictions are valid race-neutral reasons for peremptory strikes); Martin v. State, 62 So.3d 1050, 1063 (Ala.Crim.App.2010) ("Failure to answer questions on a juror questionnaire is a race-neutral reason for a peremptory strike.”); Harris v. State, 2 So.3d 880, 900 (Ala.Crim.App.2007) (religious-based reasons are race-neutral reasons for peremptory strikes); Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009) (the fact that a prospective juror "lacked mental acuity” or previously served on a jury that returned a not-guilty verdict is a race-neutral reason for a peremptory strike); and Rogers v. State, 819 So.2d 643, 649-50 (Ala.Crim.App.2001) and the cases cited therein (the inattentiveness or bias of a veniremember is a race-neutral reason for a strike).

. The analysis in our opinion in Sharp IV was grounded on this well settled principle of law and, in fact, cited Martin for that principle. In his most recent materials submitted to this Court, Sharp does not directly address Martin or the principle stated therein or the cases cited in Martin that stand for that principle. Many of his arguments, however, are inconsistent with that specific principle stated in Martin and for this Court to agree with Sharp would require us to overrule the numerous cases cited in Martin that stand for that legal principle — which Sharp has not asked us to do. For example, Sharp argues: "Had the trial court conducted the correct Batson analysis by examining all of the reasons given in light of all of the relevant circumstances of this case and applying the controlling legal princip[le]s, it would have been compelled to conclude that the prosecutor discriminated against African Americans when exercising his peremptory strikes.” (Sharp’s reply brief dated December 17, 2012, pp. 18-19 (emphasis in original).)
In concluding that the trial court’s order should be reversed, the dissenting opinion states:
”[I]n making the determination whether that one specific reason proffered by the State is pretextual or non-pretextual ... a court is required to consider all relevant circumstances, including the other reasons proffered by the State for that particular strike and the reasons proffered by the State for its other strikes. Neither Martin nor the general rule as cited in Martin say otherwise.”
151 So.3d at 377 (emphasis added). We fail to see how the belief expressed in the dissenting opinion that a court must consider "the other reasons proffered by the State for that particular strike and the reasons proffered by the State for its other strikes” is consistent with the statement in Martin that
" '[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any cither reason given need not be made,’.... [and] '[wjhere a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.' "
Although Martin examined all the reasons offered for striking the only juror at issue in that appeal and determined that all those reasons "were race neutral and that none was pretextual,” Martin, 62 So.3d at 1060, that additional analysis occurs immediately following the "general rule” stated above and is prefaced with the phrase "fejven so," indicating that even though this Court performed it, the analysis was not required. Rather, that additional analysis appears to have been done because it supported the ultimate conclusion that no Batson violation had occurred. Nowhere does Martin state that such an analysis of every reason is required in every case. In this regard, we note that this Court frequently performs additional analysis of issues beyond the bare minimum necessary to affirm or reverse a lower court's judgment. Such a practice simply makes good sense because it provides additional bases on which our decisions may be affirmed.
As to the dissenting opinion's suggestions that this Court's decision is inconsistent with McGahee v. Alabama Dep't of Corrections, 560 F.3d 1252 (11th Cir.2009), and that McGahee has declared the general rule stated in Martin *365 to be " ‘an unreasonable application of law under Batson,' " those suggestions are incorrect. McGahee — which, as the dissenting opinion notes, is not binding on this Court— did not establish a blanket rule that the general principle outlined in Martin is an unreasonable application of law under Batson. Moreover, McGahee is distinguishable from this case.
The McGahee court emphasized that this Court's decision was an unreasonable application of Batson under the circumstances of that case, which included, most notably, two circumstances not present in Sharp’s case: the prosecution in McGahee had removed all the black veniremembers, and the prosecution had stated as one of its reasons for striking a potential juror (Jones) that it “did not want to leave him individually” — which the Eleventh Circuit noted could "be read only to mean that the State did not want to leave Jones as the sole black juror on the panel.” 560 F.3d at 1264-65. Thus, McGahee held that "[t]he failure by the Court of Criminal Appeals to consider the State's articulation of an explicitly racial reason for striking Jones [was] an unreasonable application of Batson." 560 F.3d at 1264 (emphasis added).
The Eleventh Circuit also noted that this Court should have considered, under those circumstances, the prosecution’s removal of "multiple African-American jurors because of their 'low intelligence' when the intelligence of the jurors was unsupported by any evidence in the record.” 560 F.3d at 1265. As our opinion demonstrates, however, we have considered the prosecution’s "lack-of-sophistication” reason in our review of this case, but, under the circumstances, we do not find that the trial court clearly erred in denying Batson relief based on the other race-neutral reason or reasons the prosecution offered for striking the jurors in question.

. Our review of the record indicates that the two empaneled Caucasian jurors who Sharp claims lacked "sophistication” were not similarly situated to Juror no. 47, who is the only juror the trial court even initially indicated that the "lack-of-sophistication reasoning” was the basis for its finding that the prosecution’s peremptory strike of that particular juror was race neutral.

. Several Caucasian members of Sharp's jury failed to complete the jury questionnaires. As to Juror no. 38, however, the trial court made a finding that, after observing her during the voir dire process, it found her demeanor to be the primary race-neutral reason for the strike.

. Contrary to the assertion of the dissenting opinion, our opinion does not "assumed that Jurors no. 27 and 11 actually had prior convictions.” 151 So.3d at 385. Our analysis points out that the State asserted that Jurors no. 27 and 11 had prior convictions.
The dissenting opinion notes that there is no evidence in the record to support the State’s assertion that Jurors no. 27 and 11 had prior convictions and that "the trial court never made a finding of fact as to whether Jurors no. 27 and 11 actually had any prior convictions.” 151 So.3d at 385. Whether Jurors no. 27 and 11 actually had prior convictions, however, is not the question the trial court had to decide in the third step of the Batson analysis. Rather, the "decisive question” for the trial court was the credibility of the prosecutor’s explanation that one of the reasons for striking Jurors no. 27 and 11 was their prior criminal histories. See Hernandez, 500 U.S. at 365; Dretke, 545 U.S. at 252; Cockrell, 537 U.S. at 338-39. Moreover, even if the prosecution had in fact been mistaken about its assertion that Jurors no. 27 and 11 had prior convictions, that would not necessarily mean that Sharp met his burden of proving purposeful discrimination. As the *367 United States Court of Appeals for the Eleventh Circuit has stated: "Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides 'clear and convincing’ evidence of pretext.” Parker, 565 F.3d at 1271. See also McNair v. Campbell, 416 F.3d 1291, 1311 (11th Cir.2005) ("Although the prosecutor's reason for striking [the juror] was based on a belief that ultimately proved incorrect, this does not establish by clear and convincing evidence that the state court's finding of fact was erroneous, and McNair presents no additional evidence to support his contention.”).
The dissenting opinion appears to rely heavily on the State’s failure to respond in the trial court to Sharp’s "pointing] out in his written response the lack of support in the record for the assertion that Jurors no. 27 and 11 had prior convictions.” 151 So.3d at 386. Although the State did not introduce evidence indicating that Jurors no. 27 and 11 had actual convictions, it did make specific assertions that Jurors no. 27 and 11 had specific prior convictions. Sharp’s "pointing] out ... the lack of support in the record” was an argument offered in opposition to the credibility of the prosecutor's explanation that those jurors had prior convictions — but Sharp's argument is not evidence indicating that Jurors no. 27 and 11 actually did not have prior convictions. Sharp, who had the "ultimate burden of proving intentional discrimination,” Ex parte Branch, 526 So.2d at 624, had as much opportunity as the State to introduce evidence on the factual question whether Jurors no. 27 and 11 had actual prior convictions.
Finally, in support of the dissenting opinion's assertion that the State should have "at least replied] to Sharp’s argument, if not to [have] provide[d] evidence of the alleged prior convictions,” 151 So.3d at 386, the dissenting opinion cites Ex parte Thomas, 601 So.2d 56, 58 (Ala. 1992). The Alabama Supreme Court in Ex parte Thomas, however, emphasized that the State in that case had exclusive access to the evidence that Thomas could have used to evaluate the credibility of the prosecution’s stated reason for striking three of the potential jurors. The materials before us in the present case do not indicate that the State had exclusive access to records that would have indicated whether Jurors no. 27 and 11 had prior criminal records. Indeed, the State, in its rehearing application to this Court dated April 15, 2011, asserted that records verifying that Jurors no. 27 and 11 had prior criminal records are publicly available for inspection on alacourt.com, and the State provided instructions for finding those records. Sharp, although having multiple opportunities to respond to these assertions, has not disputed the State’s assertion in that regard.

. The dissenting opinion states that "the State did not even mention the juror questionnaires when providing this reason for striking Jurors no. 27 and 11, much less indicate that it was striking Jurors no. 27 and 11 because they had allegedly not answered questions truthfully.” 151 So.3d at 384. Further, the dissenting opinion suggests that, in determining whether Jurors no. 27 and 11 were similarly situated to Juror no. 24, we are " ‘imagining] a reason’ ” to support the State’s position. 151 So.3d at 385. As to Juror no. 27, however, the trial court cited her apparent failure to answer a question truthfully; the trial court made the following specific finding of fact; "In this case, the District Attorney also noted that he likely served as the prosecutor on the case but this juror never indicated that she recognized him” (emphasis added). As to Juror no. 11, the trial court specifically found: "This prospective juror provided insufficient responses to the questions asked.”

. The dissenting opinion is correct in stating that the State could have questioned Jurors no. 27 and 11 individually regarding the alleged discrepancy in those jurors' responses to the written questionnaires and the State’s belief that those jurors had prior convictions. Under the circumstances here, however, we do not think that the State’s failure to question Jurors no. 27 and 11 individually about whether they had been untruthful in their written responses about prior convictions means that the trial court clearly erred in its determination that the State did not engage in purposeful discrimination with respect to its striking of Jurors no. 27 and 11.

. Sharp also challenges the other reasons offered by the State for its strikes of Jurors no. 27 and 11. In light of our holding that those jurors’ prior undisclosed convictions provided a legitimate, race-neutral reason for the State to strike them, we need not address Sharp's arguments regarding the other rea *370 sons the State gave for striking Jurors no. 27 and 11. Martin, supra.

. Three potential jurors indicated on their questionnaires that the religion they practiced generally prohibited working on Saturdays— Juror no. 11 and Juror no. 39 indicated that they were Seventh-Day Adventists, and Juror no. 52 indicated that she was a Sabbath Keeper. The State struck all three, although only one of those jurors, Juror no. 39, actually indicated, during individual voir dire, that his religious beliefs (as a Seventh-Day Adventist) would prohibit him from serving as a juror on Saturday.
Sharp also notes Juror no. 29, a Caucasian who served on Sharp’s jury despite the following exchange during voir dire:
"THE COURT: All right. Number 29.... [Y]ou indicated that you have something on Saturday....
"[JUROR NO. 29]: Saturday afternoon, say after two o’clock, I need to set up some communion at church for Sunday service. I could do that later but I also have a play that my wife and I would go to Saturday evening. So, you know, I can get around that but that’s my preference is to do those things.”
(R. 353-54.) Juror no. 29's reference to a "Sunday service” — and his statement that although his "preference [was] to do those things” (i.e., set up for communion at his church for the service on Sunday as well as go to a play on Saturday evening) he nevertheless could "get around that” — does not indicate that Juror no. 29’s religion generally prohibited working on Saturdays. Thus, Juror no. 29 was not similarly situated to Jurors no. 11, 39, and 52.